OPINION OF THE COURT
Joseph S. Calabretta, J.
The issues remaining in this action for divorce, for determination by this court, the parties having resolved the other issues by stipulation spread upon the record in open court, are: (1) Whether the results of a voluntary human leucocyte antigen (HLA) blood test to determine paternity are admissible in evidence, and (2) If said voluntary tests are admissible herein, is plaintiff the father of the infant issue for the purposes of child support?
It appears to this court that the parties have charted their own course by voluntarily submitting to the HLA test, and defendant is now seeking to negate the validity of said tests and her participation in same. She contends that the results of the HLA test of the parties is inadmissible because said tests were submitted to voluntarily rather than pursuant to court order. (See Family Ct Act, § 418.)
The court commences an analysis of the issues armed with the strongest presumption in law as that of a child’s legitimacy. (Matter of Findlay, 253 NY 1.) This presumption is not conclusive, however, and it may be rebutted *138 where to do otherwise would outrage common sense and reason (Anonymous v Anonymous, 1 AD2d 312). To permit the plaintiff in the case at bar to pursue and attempt to prove the illegitimacy of the child, Daniel Steven Salicco, born July 24,1983, would not contravene the public policy of this State. Accordingly, the burden is on plaintiff to come forward with clear and convincing proof that he is not the father. (Matter of Anonymous v Anonymous, NYLJ, Dec. 23, 1983, p 14, col 5.)
The circumstances leading up to the issues raised herein are as follows: Plaintiff husband, by summons and verified complaint dated December 6, 1983, sought to obtain a judgment of divorce from the defendant wife on the grounds of adultery pursuant to subdivision (4) of section 170 of the Domestic Relations Law. Defendant wife, by her verified answer and counterclaim dated December 31, 1983, sought a judgment of divorce pursuant to subdivision (1) of section 170 of the Domestic Relations Law, alleging plaintiff husband’s cruel and inhuman treatment of defendant wife. The parties entered into a stipulation spread upon the record in open court on March 23, 1984, wherein they resolved all ancillary issues including equitable distribution of the marital assets, except the issue of paternity, and left for the court’s determination said issue and the determination of whether there are grounds sufficient for the granting of a divorce. The stipulation further provided that as to the paternity of the infant issue of the marriage, one Daniel Steven Salicco (born July 24, 1983), if the court should find plaintiff to be the father of the infant Daniel Steven Salicco, the court could set child support and a reasonable sum of maintenance for defendant wife for a limited and designated period of time, said amount to allow her an opportunity to rejoin the employment market. However, if the court were to find that plaintiff is not the father of the infant Daniel, the court would be precluded from making any award for child support or maintenance for defendant wife.
By order of this court, dated March 30,1984 (Calabretta, J.), and upon the consent of the parties, the court appointed a guardian ad litem, Cynthia H. Reiss, Esq., to protect the rights and interests of the infant Daniel Salicco. Said order *139 further directed the guardian ad litem to interview the plaintiff and defendant, as well as any other person or persons said guardian deemed necessary. Further, all those persons interviewed were directed to produce any and all documents in their possession or available to them, including but not limited to birth certificate, hospital and medical files and such authorization so as to permit the guardian ad litem to obtain copies of hospital and health department records. The report of the guardian ad litem was received by the court on May 7, 1984. A hearing was held before this court on June 26 and 28, 1984, to determine the issue of paternity. The court reserved decision on the divorce pending the determination of paternity at the hearing held hereon.
The plaintiff and defendant were married in the County of Queens, City and State of New York, on April 21, 1979. The parties herein have at all times since their marriage resided in the County of Queens, City and State of New York.
In 1982, plaintiff and defendant realized that they were having problems in conceiving a child. Defendant went to her doctor in January of 1982 regarding their fertility problems. Plaintiff went to see one Dr. Farrel in March, 1982. The parties separated in June, 1982, in part as an outgrowth of the fertility problems they were having. Plaintiff then went to see Dr. Lawrence Dubin in August, 1982. On September 6 or 7, 1982, Dr. Dubin performed a surgical procedure on plaintiff, a varicolectomy, to correct Mr. Salicco’s problem diagnosed as having “left varicocele”.
According to the Merck Manual of Diagnosis and Therapy (13th ed, 1977, p 747 et seq.), “varicocele” is a condition which impedes the unobstructed flow of mature sperm through the seminal tract. Although the testes may be producing spermatozoa and some sperm may be deposited in the vaginal vault, sperm density is insufficient for fertilization. A surgical procedure known as a varicolectomy may be performed to correct such condition. The expected recovery period for this procedure is two to three months. During this time period, the system recovers from the trauma of surgery and new sperm mature. There is *140 apparently a small possibility that already matured sperm in the tract can cause fertilization after the stitches are removed.
According to plaintiff’s testimony, after their first separation in June, 1982, he returned to the marital residence for about 10 days in mid-July of 1982, during which period the parties engaged in sexual intercourse and attempted a reconciliation. Plaintiff and defendant did not engage in intercourse in August or September of 1982, but, although they were not residing together, they did engage in sexual intercourse at least twice a week in October, November and December of 1982. In November, 1982, plaintiff’s grandfather died and plaintiff stated that he and defendant saw each other more often after the death. Plaintiff stated that he was confused.
On or about December 14, 1982, defendant found out that she was two weeks pregnant, and informed the plaintiff. Plaintiff testified that he asked defendant if the child was his, and she replied, “Yes”. Plaintiff requested that she have an abortion because of the marital problems the parties were having, and stated that her pregnancy was “bad timing”. The court notes that the defendant’s last menstrual period was the end of October, beginning of November. Defendant did not want to have an abortion, and assured the plaintiff that the child was his. At defendant’s request and because of her pregnancy, the parties reconciled and resumed cohabitation on January 1, 1983.
On or about May 12, 1983, defendant told plaintiff that there was “a possibility that the child was not his.” Plaintiff testified that at this time defendant had informed him that she had been engaging in sexual intercourse (without the use of any birth control device) with another man, at his apartment regularly on most Friday nights between August, 1982 and the end of November, 1982. In defendant’s conversations with the guardian ad litem, defendant confirmed the fact that she was indeed engaging in sex with another man during that period of her separation from her husband.
Defendant gave birth to Daniel Steven Salicco on July 24,1983. Said infant was a full-term baby, being born after nine months of gestation.
*141 After the birth of the infant, plaintiff and defendant were desirous of obtaining blood tests to establish whether or not plaintiff was indeed the infant’s father. The defendant testified that the plaintiff wished to share a blood test performed “only to clear his mind”, and further, he stated to defendant, “that it wouldn’t make any difference to him if the child wasn’t biologically his.”
On September 1, 1983, plaintiff, defendant and the infant Daniel went to see Dr. Leon N. Sussman at the Lindsay F. Kimball Research Institute of the New York Blood Center, located at 310 East 67th Street, New York, New York. Plaintiff testified that they had obtained the name of Dr. Sussman from an advertisement. At this juncture, the court notes that it is unquestionably clear that the parties mutually agreed and voluntarily participated in the HLA test to be set forth in more detail infra, and further, that they mutually agreed and consented to have the test performed on the infant Daniel.
Leon N. Sussman, M.D., F.A.C.P., a specialist in hematology and oncology, testified on behalf of the plaintiff regarding the laboratory testing procedures used in the preparation of his report and the results of the tests. Dr. Sussman is the Director of Kimball Research Institute, has been practicing medicine for over 50 years, and has published two books and 125 articles on paternity testing. He testified that the plaintiff, the defendant, and the child were tested at his clinic on September 1, 1983. The actual testing was performed by his assistants, who cross-checked their results in order to assure the accuracy of same. These results were then evaluated by the doctor, who thereafter prepared and certified the report.
Dr. Sussman testified that his assistants drew blood from each of the individuals for the purpose of the HLA test, and inserted the blood drawn into identified test tubes in their presence. He stated that the laboratory uses disposable test tubes, no test tube is used twice, and all work is performed right in the laboratory. Further, the plaintiff and defendant signed authorizations for the testing, and the plaintiff and defendant were fingerprinted and the infant was handprinted prior to said test.
*142 Dr. Sussman explained that HLA lymphocytes (white blood cells) carry antigens. Each of these antigens has a genetic marker. On each of the three genetic loci (A, B, and C) that are tested, an individual carries two genetic markers, one from the mother and one from the father. Thus, these genetic markers are inherited from the parents, and are subject to no change from birth to death. The doctor further testified that HLA testing can be done on a newborn baby or done even before birth. In HLA testing, the lymphocytes are separated in a series of 72 wells on each of two blocks of glass to identify the gene factors.
Dr. Sussman submitted his report, dated September 12, 1983, marked plaintiff’s exhibit 1 in evidence (CPLR 4518, subd [c]), and testified to the findings as follows:
Steven Salicco, alleged father: A2, A32; B60, B62; C3, C4
Christina Salicco, mother : A2, A30; B51, B14; C7, C8
Daniel S. Salicco, child : A3, A30; B38, B51; C7
Dr. Sussman testified and concluded that Christina Salicco did provide the HLA antigens A30 and B51 found in the child Daniel Salicco, but that Daniel Salicco’s HLA antigens A3 and B38 had to come from an outside person.
The report submitted by Dr.Sussman states in pertinent part:
“There are contradictions to the laws of theoretical expectancy in that the child Daniel S. Salicco possesses HLA A3 and B38 not present either alleged father Steven Salicco nor the mother Christina Salicco.
“The mother Christina Salicco did provide the HLA antigen A30 and B51 the child Daniel S. Salicco.
“Paternity therefore is excluded.”
Dr. Sussman testified that there is “no conceivable way known to science that Steven [the plaintiff] could possibly be the father.” Further, it was the doctor’s opinion that the procedures used for the HLA testing were reliable. The HLA test is held to have a high degree of probative value, and the “test has been encouraged on the ground that it has been found to be ‘highly accurate on the issue of paternity’”. (Michaella M.M. v Abdel Monem El G., 98 AD2d 464,466.) Cognizance of the high degree of probative *143 value of the HLA test on the issue of paternity has been taken by the courts. (See Matter of Department of Social Servs. v Thomas J. S., 100 AD2d 119, 124, citations omitted.) The presumption of legitimacy may be overcome by competent proof of exclusion such as a blood-grouping test. {Hansom v Hansom, 75 Misc 2d 3.) To exclude the plaintiff as the father of the infant Daniel, the court must find that the evidence is clear and convincing. The negative result of a reliable blood-grouping test competently conducted destroys the presumption of legitimacy. (See Anonymous v Anonymous, NYLJ, Dec. 23, 1983, p 14, cols 5, 6, supra; Anonymous v Anonymous, 1 AD2d 312; Matter of Hanley v Flanigan, 104 Misc 2d 698; Richardson, Evidence [10th ed], §59.)
The court accepts the testimony of Dr. Sussman as to the reliability, competency and completeness of the HLA tests administered in his laboratory, and the definite exclusion of the plaintiff as the biological parent of the infant. The court finds that based upon the testimony adduced, and the evidence submitted at the hearing, the plaintiff has met his burden of proof by clear and convincing evidence that he is not the father of the infant Daniel, born July 24,1983.
While it is undisputed that the court in its discretion may direct HLA testing when there is an issue of paternity raised in a proceeding (Family Ct Act, § 418, subd [a]), and that the results of a court-ordered test may be admitted into evidence (CPLR 4518, subd [c]; Family Ct Act, § 418, subd [b]), defendant contends that the results of the HLA test of the parties herein is inadmissible. She contends that because said test was not ordered by the court, either by motion or by the court, sua sponte, the court is precluded from receiving the results of said voluntary test into evidence. The court will confront the nature of voluntariness only, having already found that the HLA test performed was reliable, complete and competently administered.
Section 418 of the Family Court Act pertains to the court’s power to order HLA testing in support proceedings in which paternity is at issue. Pursuant to subdivision (b) of section 418 of the Family Court Act, the admissibility of such court-ordered tests is governed by CPLR 4518. However, CPLR 4518 is not limited to court-ordered medical *144 examinations; it applies generally to the admissibility of business and medical records. The admissibility of the tests the parties voluntarily submitted to, rather than being excludable in evidence as not ordered by the court, would fall directly within the purview and parameters of CPLR 4518 (admissibility of business records). This court takes judicial notice that in countless other forms of action before the courts of this State, the court may admit medical records of voluntary, as well as court-ordered, physical and mental examinations. Medical and psychiatric examinations need not be performed pursuant to court order to constitute competent, reliable and admissible evidence.
Moreover, in a case such as the one at bar, the circumstances surrounding the issue of paternity would certainly persuade the court to order HLA testing of the child, mother, and putative father. Plaintiff and defendant were not living together at the time Daniel was conceived. There is evidence to suggest that defendant was engaging in sexual relations with a man other than her husband. Moreover, there is some doubt as to whether plaintiff’s sperm count at the time of Daniel’s conception could have caused fertilization.
The parties herein underwent HLA testing voluntarily; there is no evidence of fraud, duress or compulsion. The record reflects that plaintiff and defendant were aware that said test might exclude paternity. In fact, it was for this very reason that the parties sought the services of Dr. Sussman. To voluntarily undergo such a test to resolve the issue of paternity, and then to claim the results thereof are inadmissible, perhaps because said results were unfavorable to the claimant, is indeed to this court an incredulous position, not countenanced by any law upon which this court in its research uncovered.
Moreover, it appears to this court that such voluntary tests are unquestionably admissible, highly probative, and perhaps in that they were undergone voluntarily should be given greater weight in the over-all determinations than those tests performed pursuant to court order.
Accordingly, it is evident from the foregoing that the court rejects defendant’s contention as hereinabove set forth.
*145 The next issue raised by the defendant is the right of the parties to waive the infant’s constitutional right to submit him to a blood-grouping test (HLA) without the court so ordering the test pursuant to section 418 of the Family Court Act.
It is undisputed that the courts have the power to direct a blood-grouping test in an action where the legitimacy of a child is in issue. (Kwartler v Kwartler, 291 NY 689; Hill v Hill, 20 AD2d 923; O’Brien v O’Brien, 4 AD2d 867.) However, the court notes that said HLA test was performed prior to the commencement of the divorce proceeding wherein the issue of support was raised within the parameters of the law.
In a paternity proceeding, section 532 of the Family Court Act requires the court to order blood tests upon motion of any party, whereas, in a support proceeding, where paternity is in issue, section 418 allows the court to exercise discretion in ordering such tests. (Matter of Department of Social Servs. v Thomas J.S., 100 AD2d 119, 126, supra, citations omitted.) “Such discretion is necessary to enable the court to protect children born during marriage from spurious claims of illegitimacy by a parent seeking to avoid the legal obligation to pay support” (supra, p 127).
At the outset, the court notes that the natural parents are the legal guardians of the infant issue of the marriage and are presumed to act in the best interests of their child. Further, at the time of testing, the infant was approximately six weeks old.
The defendant further contends that a guardian ad litem should have been appointed prior to the administration of the HLA test. However, this, of course, was not possible in that the action herein was not yet commenced and the court was necessarily unaware of the situation. Moreover, when the court was advised that paternity was at issue, the court immediately appointed a guardian ad litem to protect the rights and interests of the infant, and the proceedings herein were adjourned until the court-appointed guardian presented her report to the court. Thus, the rights of the infant were duly and adequately protected by a guardian ad litem during the pendency of the litigation herein. The *146 court finds that this contention of defendant is specious and does not invalidate or render inadmissible the results of the HLA test. The court deduces and deems that the defendant is raising the Fifth Amendment privilege against self incrimination on behalf of and pertaining to the infant.
The court finds it odd, at best, that defendant, after voluntarily consenting to the infant’s blood test, now contests the constitutionality of her consent to subject the infant to said test.
The court notes that on the issue of compelled blood tests, the privilege against self incrimination of the Fifth and Fourteenth Amendments is not triggered when a person is subjected to a blood test, a minimal intrusion, to determine if he was driving while intoxicated. (Schmerber v California, 384 US 757.) Such blood test evidence has been held to be neither testimonial nor evidence relating to some communicative act or writing; consequently, blood test evidence does not implicate the privilege (Schmerber v California, supra; Matter of Department of Social Servs. v Thomas J. S., supra, at pp 126-128). Based on this rationale, HLA blood tests were specifically held to be nonviolative of the Fifth Amendment and Fourteenth Amendment in Matter of Social Servs. v Thomas J. S. (supra); Matter of Jane L. v Rodney B. (108 Misc 2d 709); and Linda K. L. v Robert S. (109 Misc 2d 628).
Since the HLA blood tests are not testimonial and do not implicate the Fifth Amendment privilege against self incrimination, the infant’s Fifth Amendment rights were not violated when the defendant and the plaintiff consented to the HLA blood test.
Assuming, arguendo, that there was any violation of the infant’s constitutional rights, such violation would have been more than outweighed by the “public interest in reliable evidence of paternity, both for the sake of child welfare and of conservation of public assistance funds”. (Matter of Jane L. v Rodney B., supra, at p 713.) “[A] justification for the imposition of the HLA test is the State’s deep, pervasive, and abiding interest in the welfare of its children.” (Supra, at p 712, citations omitted.)
*147 Cynthia H. Reiss, Esq., guardian ad litem, is hereby awarded the sum of $750 as her fee for services rendered on behalf of the infant, which fee shall be paid equally by the parties pursuant to the order of the court dated March 30, 1984, and order of June 28, 1984.*
The foregoing constitutes the decision of the court with respect to the issue of paternity.
The plaintiff is entitled to a judgment of divorce on the grounds of adultery. Accordingly, all other ancillary relief is determined as set forth in the stipulation of the parties spread upon the record on March 23, 1984.

 The court is in receipt of a letter dated June 29,1984 wherein the attorney for the plaintiff annexed a photocopy of a cashier’s check for $750 payable to the guardian ad litem indicating payment of said fee.