COMMONWEALTH *vs.* THOMAS J. FOLEY
(and a companion case[1]).

Suffolk.    February 21, 1979. — May 21, 1979.

Present: HALE, C.J., GRANT, & DREBEN, JJ.

*Evidence,* Polygraphic test, Expert opinion, Firearm, Relevancy. *Practice, Criminal,* Trial of defendants together. *Joint Enterprise.*

At a criminal trial, polygraph test results are admissible, in the judge's discretion, only for the limited purposes and under the conditions set forth in *Commonwealth* v. *Vitello,* 376 Mass. 426 (1978), and, at the joint trial of two defendants on indictments charging armed robbery, admission of the unfavorable test results of one defendant and the inconclusive test results of the other as part of the Commonwealth's case in chief was error requiring reversal. [609]

Where the defendant's polygraph test results are admitted in evidence at a criminal trial, evidence concerning the statistical reliability of the polygraph should not be presented to the jury nor should the capabilities of the polygraph and its operator be treated on a par with scientific achievements in more established fields. [610-612]

Where two defendants were tried together and asserted a common alibi, and a retrial was necessary because of error in the use in evidence of their polygraph test results, this court expressed principles for the guidance of the trial judge in acting on a motion for severance in the event that the unfavorable test results of one of the defendants should be admissible at a retrial. [612-614]

At the trial of two defendants charged with armed robbery, a gun and bullets found in the possession of one of them at the time of his arrest were properly admitted in evidence where there was testimony that the weapon resembled the one used in the commission of the crime charged. [614]

At a criminal trial a defendant's motion for a directed verdict was properly denied, where the evidence was sufficient to enable the jury to conclude beyond a reasonable doubt that as driver of a

---

[1] Commonwealth *vs.* Leonard Baldwin.

getaway car he was part of a joint venture resulting in a robbery. [614-615]

INDICTMENTS found and returned in the Superior Court on July 13, 1976.

The cases were tried before *Tamburello, J.*

*John F. Bielagus* for Leonard Baldwin.

*Jean-Claude Sakellarios* for Thomas J. Foley.

*Leonard J. Henson,* Assistant District Attorney, for the Commonwealth.

DREBEN, J. The defendants were convicted, after a jury trial, on indictments charging them with armed robbery. They appeal under the provisions of G. L. c. 278, § 33A-33G. At the trial, conducted prior to *Commonwealth* v. *Vitello,* 376 Mass. 426 (1978), evidence of unfavorable results of a polygraph test of the defendant Foley and evidence of inconclusive results of a polygraph test of the defendant Baldwin was admitted as part of the Commonwealth's case in chief. Since the results of a polygraph examination may not be introduced during the Commonwealth's case in chief as substantive evidence of guilt, the judgments of the Superior Court must be reversed, the verdicts set aside, and a new trial ordered. *Commonwealth* v. *Vitello,* 376 Mass. at 451-452. *Commonwealth* v. *Allen,* 377 Mass. 674, 675, 677 (1979). There is no question that the unrestricted admission of the polygraph examinations was harmful.[2]

Since a new trial will be necessary, we consider the defendants' contentions which are likely to recur at a second trial. We will also discuss Baldwin's claim that his motion for a directed verdict should have been granted. The jury could have found the following facts. On July 3, 1976, at approximately 2:30 P.M., a station wagon driven

---

[2] This is confirmed by the prosecutor's closing argument where he stated, "Now, I would be less than candid if I were to admit to you that this was not a close case but for one exception, . . . and that exception I submit to you was invited by Thomas Foley and Leonard Baldwin, and that one exception is Mr. Charles Zimmerman — the [polygraph] expert who testified."

by Baldwin pulled up in front of a tourist attraction and gift shop called the Boston Tea Party Ship. Foley and an unidentified companion jumped out of the wagon and entered the gift shop while Baldwin waited outside. Once in the shop, Foley's companion pulled out a large black pistol stating, "This is a stickup." While his companion held the persons in the shop at gunpoint, Foley emptied the contents of three cash registers, one after the other, into a bag resembling a pillow case. Thereafter, the two men fled to Baldwin's waiting car and drove away.

The defendants relied on an alibi. Both claimed that at the time of the robbery they had been at Katey's Lounge, and their alibi was supported by five additional witnesses. Each of the five testified that both defendants had been at Katey's Lounge during the entire afternoon of July 3, 1976.

We now turn to the defendants' contentions.

1. *Presentation of the polygraph testimony.* As Foley may choose to testify at a second trial, his polygraph test results will, in the trial judge's discretion, be admissible for the limited purposes and under the conditions set forth in *Vitello.* In no event will the results of Baldwin's examination be admissible against him. As his test results were inconclusive, they have no relevance for the sole purpose for which they can be admitted, that is, they can neither impeach nor corroborate Baldwin's credibility if he testifies at a new trial.

The defendants argue that the trial judge permitted undue reliability to be attributed to the polygraph and its operator. This argument raises one of the major concerns of *Vitello*, namely, that the polygraph may appear to the jury to have an aura of "mystic infallibility," and may "usurp the jury's historic role of determining the credibility of witnesses . . . ." 376 Mass. at 444, 445.

The defendants' claim is based on a number of items relating to the polygraph testimony. The polygraph expert, Charles Zimmerman, was asked, "How reliable is the polygraph?" Although Zimmerman stated that he

had to rely on "competent researchers at various colleges and their results," he was permitted, over the defendants' objection, to answer. He testified that "the degree of reliability and validity is in excess of eighty-five and as high as ninety-five point five percent."[3]

Zimmerman should not have been permitted to testify before the jury as to the statistical reliability of polygraph examinations. Such testimony raised serious questions of intruding into the province of the jury, is hearsay, and is of minimal probative value. Even if statistical evidence of the general reliability of the polygraph were valid, such evidence would not warrant a finding of reliability in a particular case.[4] *Sargent* v. *Massachusetts Accident Co.*, 307 Mass. 246, 250 (1940). See *Commonwealth* v. *Whynaught*, 377 Mass. 14, 19-21 (1979). Here, the statistical studies and the reliability of the polygraph in general are still the subject of great controversy.[5] *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 425, 428-429 (1974). *Commonwealth* v. *Vitello*, 376 Mass. at 441-442. *Commonwealth* v. *Fatalo*, 346 Mass. 266, 268-269 (1963). Moreover, it appears that the question of reliability may itself be unmeasurable. Reid & Inbau, Truth and Deception 303-304 (2d ed. 1977) (hereinafter cited as Reid & Inbau). For these reasons testimony of statistical reliability should not be presented to the jury and should be limited to preliminary hearings before the trial judge. See *Commonwealth* v. *A Juvenile*, 365 Mass. at 429-430; *Common-*

---

[3] After the defendants' objections, the latter portion of the statement, namely, "and as high as ninety-five point five percent," was struck, but the first part was permitted to stand.

[4] As to the problems of assessing the integrity of the results in a particular case see *Vitello*, 376 Mass. at 451.

[5] We note that part of the function of the polygraph examiner is to establish the infallibility of the process, at least in the eyes of the person being tested. See *Vitello*, 376 Mass. at 434-435. See also *United States* v. *Alexander*, 526 F.2d 161, 168 (8th Cir. 1975), where the court pointed out that the polygrapher's assessment of the test's reliability will generally be well in excess of ninety per cent.

*wealth* v. *Vitello*, 376 Mass. at 433-434, 446-447; see also *Schaeffer* v. *General Motors Corp.*, 372 Mass. 171, 178 (1977).

The defendants also complain that Zimmerman was put on a par with scientific experts where, as yet, the polygrapher does not belong. See *Vitello, supra* at 442. For example, Zimmerman was permitted over objection to testify that the American Polygraph Association is "patterned and styled after the American Bar Association and the American Medical Association," and the judge, in the course of advising the jury on the purpose of admitting expert testimony, characterized experts as people who have superior knowledge such as "surgeons, architects, polygraph experts, engineers, ballistic experts, handwriting experts."

On retrial, the judge should impose some restraint on the usual puffery involved in qualifying an expert and some protective measures against treating the polygraph and its operators on a par with scientific achievements in more established fields. See *Commonwealth* v. *A Juvenile*, 365 Mass. at 447 (Quirico, J., dissenting).[6]

2. *Severance.* Prior to trial, Baldwin filed a motion for severance of his trial, based on the effect which the admission of Foley's polygraph results would have on him if the two defendants were to be tried together. Similar questions were raised but not decided in *Commonwealth* v. *Graziano*, 371 Mass. 596, 599-600 (1976).

Baldwin contends that since both defendants are asserting a common alibi, the admission in evidence of Foley's polygraph result is so devastating that the jury will not be able to comply with limiting instructions by the

---

[6] The defendants also contend that the polygraph expert should not have been permitted to testify to physiological responses such as "inhalation-exhalation ratios." However, the chart recordings and the physiological sensors are an inherent part of the polygraph, and testimony concerning them is proper as a basis for the examiner's conclusion. We assume they are understood by a competent examiner. See *Commonwealth* v. *Vitello*, 376 Mass. at 437 n.9 & 438 n.11.

judge. See *Bruton* v. *United States*, 391 U.S. 123, 135 (1968); *Commonwealth* v. *Clark*, 5 Mass. App. Ct. 673, 676 (1977). If Foley's polygraph examination does not support the "candor"[7] of his answer to the question as to where he was on July 3, 1976, Baldwin's defense might be substantially undercut, even if the judge were to give limiting instructions. See *Jones* v. *State*, 527 P.2d 169, 175 (Okla. Crim. App. 1974) (overruled to the extent that *Jones* permitted introduction of polygraph evidence, *Fulton* v. *State*, 541 P.2d 871, 872 [Okla. Crim. App. 1975]); Reid & Inbau, 330. It is true that under the rule of *Vitello*, Foley's polygraph result may be introduced only if Foley takes the stand and is thus available for cross-examination. *California* v. *Green*, 399 U.S. 149, 164 (1970). *Nelson* v. *O'Neil*, 402 U.S. 622, 626-630 (1971). *Commonwealth* v. *Nolin*, 373 Mass. 45, 49-50 (1977). Nevertheless, Baldwin's ability to protect himself by cross-examination against this damaging testimony might be minimal. The most he could hope for on cross-examination would be an explanation of why Foley failed on the polygraph examination. Also, Baldwin cannot protect himself, as can Foley, by a decision not to testify. In *Vitello*, this protection was considered most important in reaching the decision that polygraph evidence could be used. 376 Mass. at 455. Baldwin's decision whether to testify may depend wholly on whether Foley's test results are admitted. *Commonwealth* v. *Allen*, 377 Mass. at 677.

Here, where the impact of the unfavorable testimony looms so large, the trial judge should hold a pretrial hearing where these matters should be discussed. If it seems likely that the prosecutor will be able to introduce the polygraph evidence because Foley makes known his good faith intention to take the stand, the judge should carefully consider the instructions he intends to give to the jury as to the limited purpose of the polygraph testimony

---

[7] Zimmerman was asked if he had an opinion "as to the candor" of a particular answer.

(see *Vitello,* 376 Mass. at 456), and should also consider whether such instructions will be understandable and complied with by the jury. See *Commonwealth* v. *Clark,* 5 Mass. App. Ct. at 676. If not, the trial judge should feel impelled, as a matter of fairness to Baldwin, to give the prosecutor the option of trying the defendants separately or of waiving the use of Foley's test results. See ABA standards Relating to the Administration of Criminal Justice, Joinder & Severance § 13-3-2(b) and (c) (Approved Draft 1978); Mass.R.Crim.P. 9(d), effective July 1, 1979.

3. *Admission of Foley's gun and bullets.* The defendants also contend that it was error for the judge to admit in evidence a gun and bullets found in Foley's possession at the time of his arrest. We disagree. A gun found in a defendant's possession at the time of his arrest is admissible if it might have been used in the commission of the crime charged. *Commonwealth* v. *McLaughlin,* 352 Mass. 218, 229-230, cert. denied, 389 U.S. 916 (1967). *Commonwealth* v. *Mendes,* 361 Mass. 507, 514 (1972). *Commonwealth* v. *Smith,* 1 Mass. App. Ct. 545, 547 (1973). There was testimony that the gun used by Foley's companion was a large black automatic pistol which looked like a .45, and Foley admitted that the gun taken from him looked like a .45, though larger. The evidence was properly admitted.

4. *Other claims of the defendants.* The defendants also complain that improper statements with respect to the credibility of witnesses were made by the prosecutor during his closing argument. This and other contentions of the defendants are not discussed as they are not likely to arise at a second trial. We assume the prosecutor will comply with S.J.C. Rule 3:22A, PF 13(b), promulgated by the Supreme Judicial Court on February 19, 1979, 377 Mass. 927.

5. *Baldwin's motion for a directed verdict.* Baldwin's contention that his motion for a directed verdict should have been granted is without merit. There was evidence, when read in the light most favorable to the Common-

wealth, from which the jury could have concluded beyond a reasonable doubt that Baldwin was the driver of the getaway car and was part of a joint venture which resulted in the robbery at the Boston Tea Party Ship. *Commonwealth* v. *Blow*, 370 Mass. 401, 407-408 (1976). *Commonwealth* v. *Ferguson*, 365 Mass. 1, 7-9 (1974). *Commonwealth* v. *Gallagher*, 4 Mass. App. Ct. 661, 664 (1976). *Commonwealth* v. *Sampson, ante* 514, 518 (1979).

The judgments are reversed, the verdicts are set aside, and the cases are remanded to the Superior Court for further proceedings not inconsistent with this opinion.

*So ordered.*