## COMMONWEALTH *vs.* MICHAEL BEAUSOLEIL.

Franklin.    September 9, 1985. — April 3, 1986.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Paternity. Evidence,* Paternity, Scientific test, Competency. *Search and Seizure,* Blood sample. *Constitutional Law,* Search and seizure, Self-incrimination.

Discussion of the scientific principles and procedures involved in paternity testing. [209-211]

General Laws c. 273, § 12A, which provides for the admission of the results of a blood grouping test in evidence in a paternity proceeding to exclude the possibility of paternity of the alleged father, does not govern the admissibility of the results of a human leukocyte antigen (HLA) test. [211-213]

On the basis of published scientific and legal materials, as well as the decisions of other courts addressing the issue, this court concluded that human leukocyte antigen (HLA) testing has been accepted in the scientific community and in the courts as a reliable method of proving paternity. [215-216]

Statement of the limitations applicable to the admission in evidence of inculpatory results of human leukocyte antigen (HLA) tests in a paternity proceeding. [216-221] O'CONNOR J., concurring in part and dissenting in part, would not permit the admission of such evidence until the fact of sexual intercourse between the defendant and the mother is first established by a finding made by the trier of fact. [224-229]

Where the defendant in a paternity proceeding who requested that a human leukocyte antigen (HLA) test be performed had reasonably relied on G. L. c. 273, § 12A, in believing that the results of the test would be admissible in evidence only if they were exculpatory, considerations of fairness dictated that this court's holding permitting the evidentiary use of inculpatory test results be limited to prospective application. [221-222]

The Fourth and Fifth Amendments to the United States Constitution provide no grounds for prohibiting court-ordered human leukocyte antigen (HLA) and red blood cell testing and the admission of inculpatory test results in evidence in a paternity proceeding. [222-223]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on February 28, 1985.

The case was transferred to the Appeals Court by *Abrams,* J. Thereafter, the Supreme Judicial Court on its own initiative retransferred it from the Appeals Court.

*Bertha D. Josephson,* Assistant District Attorney, for the Commonwealth.

*Susan M. Tombs* for the defendant.

*Leah W. Sprague,* Special Assistant Attorney General, & *Cathleen J. May,* for Department of Public Welfare, amicus curiae, submitted a brief.

LIACOS, J. In this case we consider whether G. L. c. 273, § 12A (1984 ed.), providing for admission of the results of a blood grouping test in a paternity proceeding to exclude the possibility of paternity of the alleged father, prohibits the introduction of inculpatory human leukocyte antigen (HLA) test results. Further, we consider whether HLA test results may be admissible to establish paternity, if not barred by G. L. c. 273, § 12A (1984 ed.).

The defendant, Michael Beausoleil, was charged by Sharon Burke with fathering her child, in a proceeding under G. L. c. 273, § 12 (1984 ed.). The defendant moved for a court order pursuant to G. L. c. 273, § 12A (1984 ed.), requiring that he, the mother, and the child submit to an HLA blood test to determine whether his nonpaternity might be established. The trial judge allowed the defendant's motion, but proceeded to trial and took other evidence. Later, the University of Massachusetts Medical Center's department of laboratory medicine submitted a report stating that, based on a statistical analysis of the results, the probability of paternity was 98.2%, which it termed "very likely." Because the report did not exculpate the defendant, the judge entered a finding of guilty and ordered the defendant to pay child support of $75 a week. The defendant appealed for a trial de novo before a jury of six. G. L. c. 218, § 27A (1984 ed.).

Prior to the trial de novo, the Commonwealth filed a motion in limine requesting admission of the HLA test results. The judge denied the motion without a hearing.[1] The Commonwealth then filed a petition for relief pursuant to G. L. c. 211,

---

[1] The basis for the judge's denial is not apparent from the record before us.

§ 3 (1984 ed.). Treating the denial of the Commonwealth's motion as an allowance of a motion to suppress under Mass. R. Crim. P. 15 (b) (2), 378 Mass. (1979),[2] a single justice of this court transferred the case to the Appeals Court. G. L. c. 211, § 4A (1984 ed.). Subsequently, we transferred the case to this court on our own motion.

The Commonwealth asserts on appeal that the judge improperly denied its motion in limine, arguing that G. L. c. 273, § 12A (1984 ed.), does not prohibit the introduction of HLA test results to prove paternity. The defendant argues to the contrary. The Commonwealth further contends that, in the absence of any statutory prohibition, inculpatory HLA test results are sufficiently reliable to satisfy the fundamental admissibility requirements for scientific evidence. The defendant argues that the record is barren of evidence of the scientific reliability of HLA test procedures. He further argues that he would be "highly" prejudiced if HLA test results were admitted as evidence of his paternity.

Before we address these issues, a brief discussion of the basic scientific principles and procedures involved in paternity testing is warranted. In view of the absence of evidence or judicial findings, we draw on the authorities cited herein for our generalized discussion.[3]

---

[2] Rule 15 (b) (2) provides that either a defendant or the Commonwealth has the right to apply to a single justice of the Supreme Judicial Court for leave to appeal disposition by a lower court of a motion to suppress evidence prior to trial. The single justice reasoned that the trial judge's ruling is equivalent to allowance of a motion to suppress inasmuch as the practical effect is the same in both instances — the pretrial exclusion of evidence, and, thus, rule 15 (b) (2) is applicable. The single justice determined that, because of the pendency of numerous cases in the Commonwealth raising the issue of the admissibility of HLA test results, a speedy resolution is warranted and, therefore, the administration of justice would be facilitated by allowing the interlocutory appeal. Neither party contests the validity of the single justice's ruling. Cf. Commonwealth v. Yelle, 390 Mass. 678, 680-683 (1984) (trial judge's allowance of defendant's motion for admission of evidence of rape victim's sexual conduct was not equivalent to a ruling under Mass. R. Crim. P. 15 (b) (1), therefore Commonwealth had no right of interlocutory appeal).

[3] We acknowledge the assistance we have received in this regard from the amicus brief of the Department of Public Welfare.

Paternity testing is based on the existence of genetic markers which are inherited from a child's parents and are found in the various components of the blood. More than 260 genetic markers have been identified for red blood cells (red isoantigens) and over fifty genetic markers have been identified for white blood cells (white isoantigens). Paternity testing involves the identification of such markers followed by application of Mendelian rules of inheritance. Traditionally, exclusion of paternity has been the primary use to which these rules have been put. If a child lacks a genetic marker that a child of the accused must have, or if the child displays a marker that neither the mother nor the putative father has, paternity is conclusively excluded. Lee, Current Status of Paternity Testing, 9 Fam. L.Q. 615, 616-617, 621 (1975). In such cases the impossibility of the accused's paternity is established to a medical certainty. See *Commonwealth* v. *D'Avella,* 339 Mass. 642, 645 (1959) ("The reliability of [blood] tests to prove nonpaternity is well established as a scientific fact").

Six red blood cell tests most commonly have been employed in paternity testing. The first three were discovered by Dr. Karl Landsteiner and his colleagues and consist of the ABO, MNS's, and Rh systems, known collectively as the Landsteiner series. Lemmon & Murphy, The Evidentiary Use of the HLA Blood Test in Virginia, 19 U. Rich. L. Rev. 235, 238-239 (1985). These three systems yield a cumulative probability of between 52% and 57%, depending on the race of the putative father, that at least one of them will exclude paternity of a falsely accused man. Joint AMA-ABA Guidlines: Present Status of Serologic Testing in Problems of Disputed Parentage, 10 Fam. L.Q. 247, 256-258 (1976) (hereinafter, Joint Guidelines). Even with the addition of three other red isoantigen tests, Kell, Duffy, and Kidd, now typically employed in conjunction with the Landsteiner. series (enhanced Landsteiner series), the probability of exclusion of a nonfather is still no greater than 63% to 72%. *Id.* Therefore, although exclusion of paternity by means of these tests is conclusive, nonexclusion

is not, because there may remain a greater than 30% probability that a falsely accused man would not have been excluded.[4]

In recent years there have been claims of substantial advances in the field of paternity testing. HLA testing was developed in the 1960's by Dr. Paul Terasaki to determine donor-recipient compatability of organ transplants, but more recently has been used for purposes of determining paternity. See Terasaki, Resolution by HLA Testing of 1000 Paternity Cases not Excluded by ABO Testing, 16 J. Fam. L. 543 (1978). The HLA test is based on the identification and typing of more than fifty antigens found in the white blood cells. Unlike the enhanced Landsteiner series which only can be performed on blood, the HLA test can be performed on certain body tissue in which HLA antigens appear. Consequently, it is often termed a tissue typing test, although for purposes of paternity testing, economic feasibility usually dictates that it be performed on blood.

HLA testing allegedly represents an improvement over red isoantigen blood tests in two respects. First, it has a greater capability than the enhanced Landsteiner series for excluding falsely accused men. When administered by itself, the HLA test excludes between 78% and 80% of all nonfathers; this figure increases to over 90% when it is administered in conjunction with the enhanced Landsteiner series. See Joint Guidelines, *supra* at 257, 258. Second, because of this increased exclusionary capability and the relative rarity of HLA markers, it is claimed that the HLA system can be utilized to calculate a reliable statistical estimation of a accused's likelihood of paternity.[5] This statistical calculation is "made on the basis of estab-

---

[4] Thus, it has been said of such blood tests that the "substantial weight of medical and legal authority attests their accuracy, not to prove paternity, and not always to disprove it, but 'they can disprove it conclusively in a great many cases.'" *Cortese* v. *Cortese,* 10 N.J. Super. 152, 156 (1950).

[5] "The probability that a nonfather will be excluded by a set of tests [the probability of exclusion] is not the same as the probability that the nonexcluded man is the father [the probability of paternity]. While it is true that the higher the probability of exclusion, the higher the probability that the nonexcluded man is the father," there is no direct relationship between

lished data regarding the frequency with which particular genes appear in certain segments of the population and the combinations in which these genes appear in the child and putative father." *Jones* v. *Robinson,* 229 Va. 276, 280 (1985). This information is then used to derive the probability of paternity by use of Bayes' Theorem, a mathematical formula which describes the way newly discovered statistical information alters a previously established probability.[6] Peterson, *supra* at 681. In most cases in which the putative father is not excluded by HLA testing, the estimated probability of paternity will be high, typically exceeding 90%. Terasaki, *supra.*

We turn now to consideration of the issues raised on appeal. Statute 1954, c. 232, now G. L. c. 273, § 12A, is entitled, "An Act providing for blood grouping tests to aid in the determination of paternity." The statute is a so-called "exclusionary" blood test statute, that is, one permitting the introduction of blood test results only to exclude the possibility of paternity. The statute provides: "In any proceeding to determine the question of paternity, the court, on motion of the alleged father, shall order the mother, her child and the alleged father to submit to one or more blood grouping tests, to be made by a duly qualified physician or other duly qualified person, designated by the court, to determine whether or not the alleged father can be excluded as being the father of the child. *The results of such tests shall be admissible in evidence only in cases where definite exclusion of the alleged father as such father has been established.* If one of the parties refuses to

---

the two. Peterson, A Few Things You Should Know About Paternity Tests (But Were Afraid to Ask), 22 Santa Clara L. Rev. 667, 678 (1982). It is incorrect to equate the two probability calculations, as there are documented cases in which the probability of exclusion ranged from 80% to 96%, yet the probability of paternity for a nonexcluded male ranged between 4.4% and 44%. *Id.* at 678-679.

[6] Apparently, the most widely accepted way of calculating the probability of paternity involves an assumption that without regard to the HLA or other blood test results there is a 50% chance that the defendant is the father. This is termed the prior odds of paternity and is a constant. Bayes' Theorem is then used to determine how the HLA test results alter this prior probability. Peterson, *supra* at 685.

comply with the order of the court relative to such tests, such fact shall be admissible in evidence in such proceeding unless the court, for good cause, otherwise orders." (Emphasis supplied.)[7]

The statute refers specifically to "blood grouping tests," terminology that has come to be associated with the red blood cell isoantigen tests of which those comprising the enhanced Landsteiner series are typical. The HLA system, however, is a tissue typing procedure. See, e.g., Ellman & Kaye, Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?, 54 N.Y.U.L. Rev. 1131, 1139 (1979) ("HLA testing can be thought of as tissue typing rather than blood group typing"); Terasaki, supra at 543 (discussing the "HLA system of tissue types"). Thus, the Supreme Court of Ohio, construing a statute similar to G. L. c. 273, § 12A, held that HLA tests "are basically genetic comparison examinations, rather than blood grouping tests" and are, therefore, not within the statutory proscription against admission of inculpatory blood grouping tests. Owens v. Bell, 6 Ohio St. 3d 46, 53 (1983).[8]

---

[7] The statute has been amended once since its passage, the word "defendant" being deleted wherever it appeared in favor of the words "alleged father." St. 1977, c. 848, § 5. See Commonwealth v. Lobo, 385 Mass. 436, 441, 444-447 (1982); Commonwealth v. MacKenzie, 368 Mass. 613 (1975).

[8] Other courts, construing more broadly worded exclusionary statutes that refer to "blood tests" or "blood types" instead of blood grouping tests have also held that HLA tests are not encompassed by the literal statutory language. See, e.g., Cramer v. Morrison, 88 Cal. App. 3d 873, 880-882 (1979) (statute used the term "blood types" which is associated with the Landsteiner series of red cell blood grouping tests); Cutchember v. Payne, 466 A.2d 1240, 1241-1242 (D.C. 1983) (HLA test is not a blood test within the statutory meaning, but a tissue test for which blood is merely a convenient testing medium); Pizana v. Jones, 127 Mich. App. 123, 128 (1983) (although HLA testing involves the drawing of blood, "it is more accurately described as a system of tissue typing than as a blood test"); Phillips v. Jackson, 615 P.2d 1228, 1233 (Utah 1980) ("HLA tests are not necessarily properly characterized as blood tests"). But see Klein v. Franks, 111 Mich. App. 316, 319 (1981) (a commonsense reading of the term "blood test" shows that it means any test performed on blood, including the HLA test; inculpatory HLA test results are therefore inadmissible); J.B. v. A.F., 92 Wis. 2d 696, 705 (1979) (HLA is a "blood test" within the meaning of Wisconsin's exclusionary blood test statute).

We are convinced by our review of the case law from other jurisdictions as well as the available scientific and medicolegal commentary that the HLA system is not a blood grouping test, but is a tissue typing system. Assuming, however, that the statutory language is ambiguous,[9] we would be reluctant to ascribe to the Legislature by virtue of G. L. c. 273, § 12A, an intent to prohibit the introduction of evidence of paternity derived from a technique that was not in existence when the statute was enacted in 1954, long before the advent of HLA testing. At that time red blood cell isoantigen testing was prevalent, but was capable of disproving paternity only. Massachusetts, like many other States, enacted an exclusionary blood test statute to give effect to the scientific knowledge of the time. As the Supreme Court of Idaho stated, given a similar historical perspective, "it would be illogical to conclude that by enacting [the Idaho Paternity Act], the legislature expressed an intent to bar the use of evidence obtainable through scientific techniques not then known to it." *Crain* v. *Crain*, 104 Idaho 666, 671 (1983). Accord *Callison* v. *Callison*, 687 P.2d 106, 110 (Okla. 1984); *Phillips* v. *Jackson*, 615 P.2d 1228, 1233 (Utah 1980). In our view, therefore, G. L. c. 273, § 12A, does not govern the admissibility of inculpatory HLA tests.[10]

---

[9] We acknowledge that there is some support for the proposition that the HLA system is a blood grouping test. For example, one commentator includes that HLA system in a comparison of twenty-five "blood group systems." Lee, Current Status of Paternity Testing, 9 Fam. L.Q. 615, 623 (1975). Similarly, in *Hankerson* v. *Moody*, 229 Va. 270, 272 (1985), a support proceeding, the Supreme Court of Virginia stated that a laboratory technician had "performed blood grouping tests, *including HLA tests*" (emphasis added). Moreover, there has been some criticism of judicial decisions classifying HLA tests as tissue tests, thereby avoiding application of exclusionary blood test statutes. See Comment, Paternity — Human Leukocyte Antigen Test Results Are Admissible in Paternity Cases to Show the Likelihood of Paternity, 88 Dick. L. Rev. 565, 567 n.20 (1984); Comment, Paternity Testing with the Human Leukocyte Antigen System: A Medicolegal Breakthrough, 20 Santa Clara L. Rev. 511, 512-513 (1980).

[10] Nor do we think the statute precludes the introduction of inculpatory blood test results derived from a combination of HLA and red isoantigen testing. For example, the probability of an accused's paternity is derived from a so-called paternity index. This index may be based on HLA testing alone, or it may be the product of the paternity indices for a number of

We turn now to consider the admissibility of inculpatory HLA tests as a matter of the common law rules of evidence. We stated in *Commonwealth* v. *Stappen*, 336 Mass. 174, 176 (1957), that, even in the absence of statutory authority, blood grouping test results which exclude the possibility of paternity are admissible, "if otherwise competent." The court held that exclusionary blood tests satisfy this standard, noting that there is substantial authority to support the reliability of blood grouping tests to prove the impossibility of paternity. *Id.* at 176-177. See *Symonds* v. *Symonds*, 385 Mass. 540, 542 (1982). It follows that, in the absence of a statutory directive, inculpatory HLA test results should likewise be admissible if "otherwise competent."

This court has adopted the standard of admissibility for scientific evidence articulated in *Frye* v. *United States*, 293 F. 1013, 1014 (D.C. Cir. 1923), wherein the Court of Appeals stated: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." Thus, we have said that "[j]udicial acceptance of a scientific theory or instrument can occur only when it follows a general acceptance by the community of scientists involved. When supported by substantial authority establishing scientific reliability, this court has not hesitated to accept the benefits of science." *Commonwealth* v. *Fatalo*, 346 Mass.

different blood systems tested. See Peterson, *supra* at 692-693. In our view G. L. c. 273, § 12A, would apply in neither instance. As one court noted, the results produced by combining HLA tests with the Landsteiner series or other red isoantigen tests are no longer those of blood grouping tests but rather are the product of a hybrid procedure and are not specifically excluded by the language of the applicable blood test statute. *Miller* v. *Miller*, 40 Conn. Supp. 66, 69 (1984).

266, 269 (1963).[11] Cf. *Commonwealth* v. *Vitello*, 376 Mass. 426 (1978); *Commonwealth* v. *A Juvenile*, 365 Mass. 421 (1974).

Because this case is before us, in effect, as an interlocutory appeal of a denial, without hearing, of a motion in limine, we do not have the benefit of expert testimony adduced at trial on which to make the requisite *Frye* determination. We may properly consider, however, the plethora of articles concerning HLA paternity testing, as well as the decisions by other courts addressing the issue now before us. See *Commonwealth* v. *Kater*, 388 Mass. 519, 527 (1983); *Commonwealth* v. *Vitello*, *supra* at 431-439; *Commonwealth* v. *Lykus*, 367 Mass. 191, 198-199 (1975). On review of these authorities, we conclude that HLA testing has been accepted as a reliable method of proving paternity both in the scientific community and in the courts.[12]

The American Medical Association, the American Association of Blood Banking, and the American Association of Histocompatibility have all approved HLA testing to determine paternity. See *Haines* v. *Shanholtz*, 57 Md. App. 92, 100 (1984). Moreover, while there is some disagreement among medicolegal commentators as to how inculpatory HLA test results should be presented to the fact finder in paternity cases,

---

[11] We have not, however, utilized the *Frye* test to preclude the admissibility of novel scientific techniques or information developed by a particular expert witness utilizing accepted scientific instruments or theories. See, e.g., *Commonwealth* v. *Devlin*, 365 Mass. 149 (1974) (identification of parts of body by comparative analysis of X-rays).

[12] The defendant argues that published articles and judicial decisions are not a sufficient foundation on which to make a determination as to the admissibility of inculpatory HLA test results, citing *Phillips* v. *Jackson*, *supra* at 1236. In *Phillips*, the Supreme Court of Utah stated that medical and legal periodicals "are not sufficient, absent expert testimony, for this Court to determine as a matter of law the issue of general admissibility [of HLA test results], especially in view of the paucity of legal opinions on this point." *Id.* Since 1980, when *Phillips* was decided, a substantial body of case law addressing the issue of the admissibility of HLA test results, as well as an ever-increasing volume of relevant scientific and legal periodicals, has developed. We find these sources sufficient to permit an informed decision as to the reliability of HLA testing and its general acceptance in the scientific community.

nearly all agree that such evidence is reliable and should be admitted in one form or another. See, e.g., Ellman & Kaye, Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?, 54 N.Y.U.L. Rev. 1131, 1161 (1979); Page-Bright, Proving Paternity — Human Leukocyte Antigen Test, 27 J. Forensic Sci. 135, 143, 150 (1982); Peterson, A Few Things You Should Know About Paternity Tests (But Were Afraid to Ask), 22 Santa Clara L. Rev. 667, 676 (1982); Lemmon & Murphy, The Evidentiary Use of the HLA Blood Test in Virginia, 19 U. Rich. L. Rev. 235, 238-239 (1985). Finally, those courts in other jurisdictions that have determined the admissibility of inculpatory HLA test results by reference to *Frye* have concluded unanimously that such evidence is generally accepted as reliable in the scientific community.[13] See *Crain* v. *Crain, supra* at 672; *Tice* v. *Richardson*, 7 Kan. App. 2d 509, 513 (1982); *Perry* v. *Commonwealth ex. rel. Kessinger*, 652 S.W.2d 655, 661 (Ky. 1983); *Haines* v. *Shanholtz, supra* at 98; *Imms* v. *Clarke*, 654 S.W.2d 281, 284 (Mo. App. 1983); *Callison* v. *Callison, supra* at 111.[14]

Although we conclude that HLA testing is generally accepted in the scientific community as a reliable means of determining paternity, and that inculpatory evidence derived from HLA

---

[13] In *Cramer* v. *Morrison*, 88 Cal. App. 3d 873, 887 (1979), the court cited articles in medical and legal periodicals "lauding the HLA tests as an improved and reliable method for determining paternity," but declined to determine on the record before it whether the test had gained general acceptance in the scientific community as proof of paternity. The case was remanded to the trial court for determination of that issue.

[14] In addition to the cases cited, a number of courts, without applying the *Frye* standard, have declared HLA testing a reliable technique for determining paternity. See *Carlyon* v. *Weeks*, 387 So. 2d 465, 468 (Fla. Dist. Ct. App. 1980); *Davis* v. *State*, 476 N.E.2d 127, 135-136 (Ind. App. 1985); *Owens* v. *Bell*, 6 Ohio St. 3d 46, 53 (1983); *Turek* v. *Hardy*, 312 Pa. Super. 158, 161 (1983); *South Carolina Dep't of Social Servs.* v. *Bacot*, 280 S.C. 485, 489 (1984); *Hankerson* v. *Moody*, 229 Va. 270, 275 (1985). Even those few courts that have barred the introduction of inculpatory HLA test results on the basis of exclusionary blood test statutes within their respective jurisdictions have conceded that HLA testing can indicate paternity reliably. See *Cardenas* v. *Chavez*, 103 Mich. App. 646, 648 (1980); *J.B.* v. *A.F.*, 92 Wis. 2d 696, 702-705 (1979).

testing is therefore admissible, we think it prudent to adopt the following limitations on the affirmative use of such evidence.

First, inculpatory HLA test results may not be presented to the jury expressed simply in the form of a probability of exclusion calculation, that is, as a stated percentage of the population of nonfathers who would have been excluded by the specific array of tests conducted. The probability of exclusion may be relevant to the issue of paternity as it tells the jury that the defendant falls within the relatively small per cent of the male population who could have fathered the child; however, "it does nothing to distinguish the true father from the perhaps millions of men who fall into this group." Peterson, *supra* at 680. Furthermore, the jury are apt to confuse the probability of exclusion with the likelihood of paternity even though there is no direct relationship between the two. See notes 4 & 5, *supra*. Thus, even if the probability of exclusion is considered relevant, "the potential for confusing and misleading the factfinder is so great that the court should exclude it under its general power to exclude evidence which creates a substantial danger of prejudice, of confusing the issues, or misleading the fact-finder" (footnote omitted). Peterson, *supra*. See Proposed Mass. R. Evid. 403. See also *State ex rel. Hausner* v. *Blackman*, 233 Kan. 223, 229 (1983) (probability of exclusion is not probative on the issue of paternity and its introduction is prejudicial); *Imms* v. *Clarke, supra* at 285 (probability of exclusion, unless in "extreme range," is of little aid to jury in determining paternity issue); *Davis* v. *State*, 476 N.E.2d 127, 137 (Ind. App. 1985) (probability of exclusion, without more, has been viewed as incomplete and misleading).

Second, we believe it preferable that the HLA test results be presented to the jury in terms of the probability of paternity,[15]

---

[15] The admission of evidence of statistical probability is disfavored in this Commonwealth. *Commonwealth* v. *Drayton*, 386 Mass. 39, 50-51 (1982). *Commonwealth* v. *Foley*, 7 Mass. App. Ct. 608, 611-612 (1979). We recognize that, when a probability of paternity calculation is admitted in a paternity action, it is arguable that the jury are presented essentially with a statistical estimation of the defendant's likelihood of guilt. It is true as

as that has been termed "the most accurate way of conveying the significance of the test data." Ellman & Kaye, *supra* at 1146. It appears to be generally accepted in the scientific community that a statistically meaningful probability of paternity calculation can only be derived from a combination of HLA and red blood cell tests yielding a mean probability of exclusion of 90% or more. See Joint Guidelines, *supra* at 256-258; *Imms* v. *Clarke, supra* at 286. Accordingly, as a further limitation on the affirmative use of HLA evidence, we conclude that the jury may be presented with a statistical estimate of the putative father's likelihood of paternity only where the combined tests administered would exclude at least 90% of the nonfathers tested.[16]

Third, we think it necessary to establish a minimum threshold for admissibility of probability of paternity estimates. The Joint Guidelines recommend that, if the blood test results show a "strong likelihood" of paternity, the evidence should be presented to the jury. This is to be determined by reference to a table in the Joint Guidelines matching various probabilities of

well, however, that we permit an expert to testify as to the likelihood that fingerprint, voice print, or handwriting samples that he has compared are from the same individual. Such testimony is necessarily probabilistic in nature, whether or not the expert's opinion is actually phrased in terms of a stated probability that, for example, a fingerprint found at the scene of a crime was that of the defendant. Moreover, in many criminal cases the identification of the offender is contested, and resolution of what is then the de facto ultimate issue may hinge entirely on fingerprint or voice print identification. Thus, we do not think that the introduction in a paternity action of a probability of paternity estimate based on accepted scientific principles is readily distinguishable from the type of admissible scientific evidence often introduced in criminal cases for purposes of identification.

[16] This would permit calculation of the accused's probability of paternity where the HLA test was administered with the enhanced Landsteiner series of red blood cell tests, which is currently the recommended practice. Whether the results of an HLA analysis done without use of concurrent red blood cell tests should be admitted will depend on whether the HLA test alone can produce the minimal 90% exclusion factor to which we allude in the text. See *Haines* v. *Shanholtz, supra* at 95 & n.1 (stating that HLA testing alone produces a 92% probability of exclusion of nonfathers, citing testimony presented to the Senate Judicial Proceedings Committee). Cf. Joint Guidelines, *supra* at 255, 257 (stating that probability of exclusion of nonfathers under HLA testing alone is between 78% and 80%).                    ,

paternity with corresponding "verbal predicates." Probabilities of paternity between 90% and 95% are said to make paternity "likely," while those between 95% and 99% make it "very likely." Joint Guidelines, *supra* at 262, 282. Thus, we read the Joint Guidelines as recommending that probabilities of paternity below 95% be inadmissible. This accords with the view of many commentators. As one stated: "The significance of a 'high' probability of paternity is difficult to evaluate. It is clear that nonexcluded nonfathers can score comparatively high probabilities of paternity (since most nonfathers are excluded, the rest must of necessity 'fit' reasonably well). In one study, as many nonexcluded nonfathers scored over 88% as scored under 88%. On the average, fathers have higher probabilities of paternity than nonexcluded nonfathers (in the same study, the mean for fathers was 98.04%), so a paternity index must be rather high before it really differentiates the nonexcluded nonfathers from the (obviously nonexcluded) fathers. There is no general agreement in the scientific community that a probability below 95% has significance. Scientists generally agree that a probability greater than 95% . . . is significant, so significance should be attached only to those probabilities exceeding 95%." (Footnote omitted.) Peterson, A Few Things You Should Know About Paternity Tests (But Were Afraid to Ask), 22 Santa Clara L. Rev. 667, 707-708 (1982).[17] We agree, and require that inculpatory blood test evidence shall be admissible only if the probability of the putative father's paternity is 95% or greater.

Fourth, though admissible, inculpatory blood test evidence establishing a likelihood of paternity equal to or greater than 95% should not be conclusive on the issue of paternity. It is

---

[17] See Armitage & Cross, Paternity Testing in a Judicial Setting, 39 J. Mo. B. 477, 480 (1983) (suggesting that whenever the calculated probability of paternity for a putative father is less than 95%, the level below which they deem any inculpatory results nonprobative, more tests should be conducted either to raise this figure to an acceptable level for presentation to the trier of fact as evidence of paternity, or to exclude the putative father); *Haines* v. *Shanholtz*, 57 Md. App. 92, 96 (1984) (citing a recently enacted Maryland blood test statute authorizing admission of inculpatory blood test results where the statistical probability of the alleged father's paternity is at least 97.3%).

merely some evidence of paternity which the jury must consider, along with all of the other evidence presented in making their determination.[18] See, e.g., *Crain* v. *Crain, supra* at 672-673; *Turek* v. *Hardy*, 312 Pa. Super. 158, 163 (1983); *South Carolina Dep't of Social Servs.* v. *Bacot*, 280 S.C. 485, 489 (1984). The jury are free, for example, to disbelieve that the putative father ever had intercourse with the mother, or that he had intercourse with her during the period of probable conception, despite the blood test evidence indicating a high likelihood of paternity. In such a case, the jury would be warranted in concluding that paternity had not been established. See, e.g., *Commissioner of Social Servs. of the County of Erie ex rel. Mannion* v. *Murray*, 112 A.D.2d 724 (N.Y. 1985) (finding of nonpaternity affirmed despite a greater than 90% probability of paternity because Family Court judge was warranted in disbelieving mother's testimony). We emphasize that HLA evidence is but one factor for the jury's consideration.

Finally,[19] inculpatory HLA blood test evidence shall be admissible only if a proper foundation is laid establishing that

---

[18] We do not attempt here to formulate a jury instruction to accompany the introduction of inculpatory blood test evidence. We point out, however, that juries should be informed that statistical evidence of the accused's likelihood of paternity is not conclusive, and that other evidence indicating nonpaternity may raise a reasonable doubt as to the defendant's paternity. Further, it should be clear that HLA test results are *not* evidence of intercourse. Consequently, absent a determination by the judge that there is other evidence which would warrant a jury's finding of intercourse during the period of probable conception, such HLA test results should be excluded. Additionally, the judge should instruct the jury, if he is so requested, that they may not consider HLA test results as evidence of intercourse, and that they may not consider such evidence of paternity unless they have found, beyond a reasonable doubt, that sexual intercourse at or about the time of conception had taken place between the mother and the alleged father.

[19] There has been criticism of the probability of paternity statistic because it is based on a preliminary assumption of a 50% likelihood of the accused's paternity. In other words, the calculation starts with the premise that the accused and one random male both had intercourse with the mother "at a time, and under circumstances, in terms of timing, fertility, frequency of coition, and use of birth control, making them both *equally likely to have fathered the child*" (emphasis in original). Peterson, *supra* at 685. Critics point out that the actual prior odds of paternity in a given case, based on

proper testing procedures were employed in the particular case and that the expert witnesses through whom the evidence is sought to be introduced are qualified properly. See *Commonwealth* v. *Vitello*, 376 Mass. 426, 456 (1978); *Tice* v. *Richardson*, 7 Kan. App. 2d 509, 513 (1982); *Phillips* v. *Jackson*, 615 P.2d 1228, 1235 (Utah 1980). This determination is, of course, for the trial judge to make in the first instance as a threshold inquiry whenever inculpatory blood test results are sought to be introduced.

The estimated probability of the defendant's paternity in the instant case is 98.2%, above the minimum threshold for admissibility established today. Although the record indicates that this figure was derived from HLA and red blood cell typings, it is not clear exactly what red blood cell tests were performed and whether the cumulative probability of exclusion for all the tests administered was at least 90%. Normally, we would remand the case to the trial judge to make this factual determination. However, we conclude that a remand is unnecessary in this instance.

---

the nonblood test or "soft" evidence adduced will rarely coincide with this assumption. Consequently, the ultimate probability of paternity estimate is only correct in those few cases in which the fact finder believes initially that the probability of paternity is exactly 50%. *Id.* at 684-686. Thus, various proposals have been advanced so that the jury might be enabled to determine the probability of paternity based on their own initial assessment, on consideration of the soft evidence, of the prior odds of paternity. See, e.g., Ellman & Kaye, Probabilities and Proof: Can HLA and Blood Group Testing Prove Paternity?, 54 N.Y.U.L. Rev. 1131, 1152-1158 (1979) (suggesting that expert witness should demonstrate by means of a chart the effect the blood test results would have on a juror's own estimates of the prior odds of paternity); Peterson *supra* at 686-689 (proposing a formula which jurors could use to determine how their own conclusions regarding the prior odds of paternity would affect the probability of paternity estimate based on an assumed 50% prior probability). While we acknowledge the basic flaw in the probability of paternity calculation, we reject these alternative proposals as unduly complicated. In our view, they present an even greater likelihood that the paternity adjudication will degenerate into a trial by mathematics than if a single probability of paternity estimate is introduced. We leave to defense counsel the task of highlighting on cross-examination the exact nature of the probability of paternity calculation and its weaknesses.

Considerations of fairness dictate that the results of the blood tests sought to be introduced to prove the defendant's paternity be excluded. The defendant requested that the HLA blood test be performed pursuant to G. L. c. 273, § 12A, citing the statute in his motion to the judge. It was clearly his belief that, under the terms of this statute, the results of the test would be admissible only if exculpatory. No judicial decision had given him cause to assume otherwise. See *Commonwealth* v. *Blazo*, 10 Mass. App. Ct. 324 (1980).[20] We think the defendant's reliance on G. L. c. 273, § 12A, reasonable, and we decline to apply today's decision retroactively to this defendant.

Last, because of its implications in future paternity cases, we address briefly the defendant's claim that court-ordered HLA blood testing, against a defendant's wishes, raises constitutional issues under the Fourth and Fifth Amendments to the United States Constitution.[21] In *Schmerber* v. *California*, 384 U.S. 757, 766-772 (1966), the United States Supreme Court held that the extraction of a blood sample from a nonconsenting defendant charged with driving an automobile while

---

[20] In *Commonwealth* v. *Blazo, supra,* a prosecution for fathering an illegitimate child in violation of G. L. c. 273, § 11, since repealed, the Appeals Court held that the trial judge had not abused his discretion in denying the defendant's motion under G. L. c. 273, § 12A, that the parties submit to HLA testing. The court reasoned that at the time the request was made the reliability of HLA testing was not yet established. Recognizing that it is now accepted as the single, most powerful blood testing system for excluding putative fathers, *id.* at 326, the court went on to state that in future paternity cases judges carefully should consider ordering HLA testing when so requested by the defendant. *Id.* at 327. This dictum may be viewed as expressing the conclusion that HLA testing comes within the statutory language of G. L. c. 273, § 12A. See *id.* at 327 n.1. Although we reach a contrary conclusion today, we agree with the underlying premise in *Blazo*, that HLA testing is a reliable means of excluding paternity. On this point there is no dispute. Thus, exculpatory HLA test results are admissible absent statutory authority, *Commonwealth* v. *Stappen*, 336 Mass. 174, 176 (1957), and such results may be conclusive on the issue of paternity. *Commonwealth* v. *D'Avella*, 339 Mass. 642, 645 (1959).

[21] We note that art. 12 of the Declaration of Rights of the Constitution of the Commonwealth is not necessarily coextensive with the Fifth Amendment and may provide broader protection against self-incrimination. See *Commonwealth* v. *Hodge*, 386 Mass. 165, 169 (1982). The parties have not raised the issue of art. 12 in their briefs.

under the influence of intoxicating liquor was reasonable in the circumstances and did not violate the defendant's right against unreasonable searches and seizures under the Fourth Amendment, or his privilege against self-incrimination, guaranteed by the Fifth Amendment. As to the Fourth Amendment, the Court noted that there was probable cause to arrest the defendant for the crime charged, and stated that the extraction of blood is a commonplace procedure involving virtually no risk, trauma, or pain. *Id.* at 768, 771. With regard to the Fifth Amendment claim, the Court held that the privilege against self-incrimination only protects against testimonial compulsion and does not extend to compulsory blood testing, because blood-testing evidence is physical in nature rather than testimonial. *Id.* at 764.

HLA and red blood cell testing procedures are no more intrusive or testimonial than those at issue in *Schmerber*. In addition, probable cause to believe that the test results will be inculpatory exists when a complaint is issued on probable cause, as in the instant case, charging a putative father with paternity. Consequently, the Fourth and Fifth Amendments provide no grounds for prohibiting court-ordered HLA and red blood cell testing.[22] See *State* v. *Meacham*, 93 Wash. 735 (1980) (court rejected right to privacy and Fourth Amendment challenges to court-ordered HLA testing); *Albany County Dep't of Social Servs. ex rel. Sousis* v. *Seeburger*, 112 A.D.2d 674, 675-676 (N.Y. 1985) (court rejected right to privacy, Fourth Amendment, and Fifth Amendment challenges to court-ordered HLA testing).

---

[22] Thus, in theory, the defendant might be ordered by the trial judge to submit to HLA and red blood cell testing on remand. Although such an order would not implicate directly those fairness concerns discussed, *supra*, which involved the defendant's justifiable reliance on the statutory language of G. L. c. 273, § 12A, and the *Blazo* decision in *requesting* HLA testing, we think the basic fairness consideration still applicable. The statutory and case law in this Commonwealth prior to today appeared to prohibit the introduction of inculpatory blood test results, and we think any change in that regard ought to apply prospectively only to defendants charged after the date of this opinion.

In summary, we hold that HLA tests are not blood grouping tests within the meaning of G. L. c. 273, § 12A. Exclusionary results relevant at common law (see *supra* at 222 & note 20) may, however, be admitted. Further, we conclude that HLA testing is accepted generally in the scientific community as a reliable procedure for proving or excluding paternity. On offer of the prosecution, statistical evidence of the accused's probability of paternity shall be admissible provided the HLA test on which the calculation was derived, either alone or in conjunction with whatever standard red isoantigen tests were performed, yields a cumulative probability of exculsion of 90% or greater, and provided further that no evidence of probability of paternity under 95% shall be admissible. Such inculpatory evidence is not conclusive on the issue of paternity, and its admission is subject to normal foundational requirements for the admission of scientific evidence.

The inculpatory HLA test results sought to be introduced in the instant case shall be excluded, and the defendant may not be compelled to undergo additional blood tests. After the date of this opinion, an alleged father (as well as the mother and child) may be required to submit to such test procedures (see *supra* 222, 223). Trial on the paternity charge is to proceed in accordance with this opinion.

*So ordered.*


O'CONNOR, J. (concurring in part and dissenting in part). I concur in the result reached by the court because I agree that it would be unfair to apply retroactively to the defendant the evidentiary rule announced today.

The bulk of the court's opinion addresses the future admissibility of probability of paternity estimates based on HLA test results to establish paternity, and it is to that subject that I direct my attention. I agree that the HLA procedure is a tissue test, not a blood test, with the consequence that the admissibility of HLA test results and probability of paternity estimates based thereon is not controlled by G. L. c. 273, § 12A (1984 ed.).

I agree too, that, probable cause having been found, there is no constitutional impediment to a court order requiring a defendant to submit to HLA testing. Furthermore, I accept the court's conclusion that HLA testing has gained general acceptance in the appropriate scientific community as a reliable indicator of the probability of paternity if it be established by other evidence that the defendant had intercourse with the mother at a time and under conditions that reasonably might have lead to the conception in question. I conclude, however, differently from the court, that, because the probability of paternity yielded by a statistical analysis employing HLA test results is premised on an assumption that that intercourse occurred, the test results should not be admitted in evidence unless that assumed fact is first established by a finding made by the trier of fact. That, of course, would require bifurcation of the trial, a procedure which is neither alien to our practice nor unduly burdensome, and, in my view, is dictated in paternity proceedings by considerations of fairness.

The court notes, *ante* at 211, that "the probability of paternity [is derived] by use of Bayes' Theorem, a mathematical formula which describes the way newly discovered statistical information alters a previously established probability." The court explains, *ante* at 211 n.6, that "[a]pparently, the most widely accepted way of calculating the probability of paternity involves an *assumption* that *without regard* to the HLA or other blood test results there is a 50% chance that the defendant is the father. This is termed the prior odds of paternity and is a constant. Bayes' Theorem is then used to determine how the HLA test results alter this prior probability" (emphasis added). The court further explains, *ante* at 220-221 n.19: "There has been criticism of the probability of paternity statistic because it is based on a preliminary assumption of a 50% likelihood of the accused's paternity. *In other words* [emphasis added], the calculation starts with the premise that the accused and one random male both had intercourse with the mother 'at a time, and under circumstances, in terms of timing, fertility, frequency of coition, and use of birth control, making them both *equally likely to have fathered the child*' (emphasis in original). Peterson,

[A Few Things You Should Know About Paternity Tests (But Were Afraid to Ask), 22 Santa Clara L. Rev. 667,] 685 [1982]." A relevant portion of Peterson's article supporting the court's understanding and giving enlightenment about the test's assumption is set forth in the margin.[1]

---

[1] "In a paternity trial, a fact-finder is naturally tempted to seize upon statistical figures, like the paternity index or the probability of paternity, as lifelines of objective truth in a sea of prevarication. 'Soft' evidence involving difficult questions of credibility and other circumstantial matters may be submerged or lost because it appears unnecessary to resolve the questions in light of the hard, scientific, mathematical proof. Under these circumstances it is absolutely essential that the significance of the mathematical proof be clearly understood by both counsel and the fact-finder.

"The paternity index, and the probability based upon it, can be easily misused. Returning to the example of the man with a paternity index of 19 (probability = 95%), it is clear that in a large population many men will have a phenotype compatible with fathering the child. If only one man in a thousand were to have the proper phenotype, there would be 1,000 men who could have fathered the child in an urban population containing only one million men. Bayes' Theorem cannot tell us which of these 1,000 men is the father. The most that the blood group evidence can tell us is that, assuming paternity is limited to the men in this city and the defendant is one of them, his probability of paternity is only one in a thousand, or .1%.

"The reason for this apparent discrepancy between the relative probability of 95% and the actual probability of .1% is clear if we again consider Bayes' Theorem. The Theorem only tells us how to modify the prior odds of paternity in light of the new blood test evidence. The Theorem can do nothing to tell us what those prior odds are. Without the prior odds as a multiplier, Bayes' Theorem is virtually useless.

"The paternity index merely represents the relative likelihood that a man with the phenotype of the accused father would contribute the required genes compared with the likelihood that a random man of the same ethnic group would do so. In order to convert this figure into the actual probability of paternity, we must also know the probability that the accused father had intercourse at the right time, and the probability that a random man did likewise. If the accused had no intercourse, then, regardless of his index, his probability of paternity is zero. If the accused is the only man to have had intercourse then, regardless of his index, his probability of paternity is 100%. The paternity index equals the odds of paternity only if it is assumed that the prior odds of paternity are 1:1 (or the accused is already 50% likely to be the father). *In other words, before the paternity index accurately represents the odds of paternity, one must assume that the defendant had intercourse with the mother and that a random man (whom we shall call Mr. X) also had intercourse with her. In addition, the calculation assumes that both had intercourse at a time, and under circumstances, in terms of timing, fertility, frequency of coition, and use of birth control, making them*

No test tends to prove a fact it assumes. The HLA test, therefore, has no relevancy to the question, typically the one critical question in a paternity case, whether the defendant had intercourse with the mother at a time and in circumstances that would explain the conception of the child. Apparently, the court agrees, for it states that "HLA test results are *not* evidence of intercourse," see *ante* at 220 n.18. The court also states that "the judge should instruct the jury, if he is so requested, that they may not consider HLA test results as evidence of intercourse, and that they may not consider such evidence of paternity unless they have found, beyond a reasonable doubt, that sexual intercourse at or about the time of conception had taken place between the mother and the alleged father." *Id.*[2]

Although HLA test results are not legitimately helpful to a resolution of the question whether a defendant had intercourse with the mother in relevant circumstances, it would be naive

---

*both equally likely to have fathered the child. If these assumptions are true, then, and only then, does Bayes' Theorem accurately reflect the odds that the accused is the father.*

"Since there is no way to calculate the prior odds of paternity, they must be inferred from the 'soft' evidence — the testimony of witnesses, circumstantial evidence, admissions and all of the other evidence which the fact-finder may prefer to ignore in favor of the 'scientific proof.' *Until the fact-finder, disregarding the paternity index, is persuaded that the above assumptions are true, use of Bayes' Theorem will yield a false result.*

"Time and again, courts, commentators, and possibly even experts have disregarded the importance of the soft evidence and jumped hastily to the conclusion that the paternity index represents the actual odds of paternity. As a practical matter it may well be that justice is usually done because the soft evidence would justify the conclusion that the above assumptions are satisfied. The danger is that the habit of incorrectly applying these statistics will mesmerize fact-finders to such an extent that the statistics will be improperly used in cases where the soft evidence is truly weak." (Emphasis added.) Peterson, *supra* at 684-686.

[2] HLA tests may be compared with fingerprint comparisons and the like as scientifically acceptable procedures to establish probabilities, as the court observes, *ante* at 217 n.15. However, it is important to understand that fingerprint comparisons are designed to show that the defendant was at the scene of the crime at a relevant moment, or that the defendant was in possession of a particular object related to the crime, while HLA tests are not designed to show that the defendant was "on the scene" at the critical time, but only what the probability of his paternity is if he was on the scene.

in the extreme to expect fact finders, particularly inexperienced jurors, to ignore evidence of probability of paternity estimates based on HLA test results, presented through an expert, in determining the usually contested issue whether such intercourse had taken place. In the typical case, the mother asserts, and the defendant denies, the defendant's involvement. The Commonwealth has the burden of proving the defendant's involvement beyond a reasonable doubt. See *Commonwealth* v. *Lobo*, 385 Mass. 436, 445 (1982); *Commonwealth* v. *MacKenzie*, 368 Mass. 613, 619 n.5 (1975). It cannot be said reasonably and with confidence that an expert's testimony that the probability of the defendant's paternity is 95% will not be misused by the fact finder to resolve the credibility issue in the Commonwealth's favor. Even if an assumption be gratuitously made that the expert's testimony will be fairly and clearly given and skillfully tested on cross-examination, the danger that the fact finder will be moved to decide between the conflicting claims on the basis of the expert's testimony that the defendant "fits the mold" is inescapable. The portion of Peterson's article quoted in n. 1 of my opinion supports that proposition.

The court recognizes the risk of which I speak, but, in my view, does not adequately appreciate or deal with it. The court counters the risk by requiring the judge, if requested in a jury case, to instruct the jury not to consider HLA test results as evidence of intercourse, and not to consider that evidence "unless they have found . . . that sexual intercourse at or about the time of conception had taken place between the mother and the alleged father." *Ante* at 220 n.18. Because the interests at risk are so substantial, the incidence of risk is so high, and a way to avoid the risk is so simple, I am not content to meet the risk by simply requiring jury instructions.

"The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." *Krulewitch* v. *United States*, 336 U.S. 440, 453 (1949) (Jackson, J., concurring) (citation omitted). See *Bruton* v. *United States*, 391 U.S. 123, 135 (1968) ("[T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and

the consequences of failure so vital to the defendant that the practical and human limitations of the jury system cannot be ignored"); *Commonwealth* v. *DiMarzo*, 364 Mass. 669, 681-682 (1974) (Hennessey, J., concurring) ("It is reasonable for us to be confident that in most cases limiting instructions accomplish their intended purpose. Nevertheless, in cases . . . where the evidence subject to limitations has an extremely high potential for unfair prejudice, we have a duty to be skeptical as to the effectiveness of limiting instructions . . . . The reasoning of the *Bruton* case is highly relevant . . . since that case recognized the futility, even the absurdity, of expecting a jury in some circumstances to conform to limiting instructions").

Because of the futility in expecting triers of fact, especially juries, to comply with an instruction to ignore the probability of paternity factor based on HLA testing in determining whether the defendant had intercourse with the mother at or about the time of conception, I would hold that HLA based probability of paternity estimates are inadmissible except in the second segment of a bifurcated trial following a finding on that critical issue by the judge or the jury. After an affirmative finding, and within the limitations expressed by the court, *ante* at 217-221, I would hold the evidence to be admissible to show the probability that the defendant is the father of the child. Obviously, then, if the court were to accept my reasoning, the utility of HLA-based probability paternity estimates would be quite limited. Such evidence not only would be inadmissible in the absence of the above finding, but it would be superfluous in any case in which the fact finder (perhaps the jury in response to a special question) finds beyond a reasonable doubt that the defendant was the only one to have had intercourse with the mother at a relevant time. The test results would have value only in those cases in which it is open to the defendant to contend that, even though his act could have resulted in the conception, another man or other men, perhaps unidentified, also had sexual relations with the mother at a relevant time. It is at that time, and only then, that a probability of paternity estimate meeting the requirements articulated by the court is highly probative without being unfairly prejudicial to the defendant.