ANONYMOUS, Respondent, *v.* ANONYMOUS, Appellant, and ANONYMOUS, Respondent.

Second Department, March 26, 1956.

*Sidney Salant* for appellant.

*Herbert Rabinowitz* for respondents.

*Louis M. Brass,* special guardian in person.

Beldock, J. This is an action for separation by a wife based upon abandonment, nonsupport and cruel and inhuman treatment. The supplemental complaint alleged that the parties were married in 1946 and have three daughters; one six and a half years of age, and twins five years of age. The claimed abandonment occurred on December 23, 1954. The answer admits paternity of the older child but denies the paternity of the twin daughters, and denies the allegations of abandonment, nonsupport, and cruel and inhuman treatment. A counterclaim for divorce, interposed by defendant, alleges that plaintiff and a named corespondent had been living in adulterous intercourse continuously since October 1, 1948; that the twins, whose paternity defendant denies, were born in October, 1949; that five years have not elapsed since the discovery of the adultery, and that defendant has not cohabited with plaintiff since such discovery. The corespondent was served with the answer and has served a pleading denying all the allegations of defendant's answer and counterclaim.

After joinder of issue, defendant moved for an order directing a blood grouping test of himself, the plaintiff, the twins, and the corespondent, for the purpose of excluding his paternity of the twins.

Section 306-a of the Civil Practice Act provides: " Wherever it shall be relevant to the prosecution or defense of an action * * * the court, by order, shall direct any party to the

action * * * and the child of any such party and the person involved in the controversy to submit to one or more blood grouping tests * * *. Whenever such test is ordered and made, the results thereof shall be receivable in evidence only where definite exclusion is established.''

The motion was denied at Special Term, resulting in the order appealed from.

Before discussing the merits of the application, it is well to outline the rather unusual events which precipitated this litigation. On December 22, 1954, the husband discovered eight separate writings (letters, cards and a telegram) allegedly written by the corespondent to plaintiff. These communications contained significant references to specific incidents of intimate relations between plaintiff and the writer. The first writing is dated February 1, 1948 (as stated, defendant charges the adulterous intercourse commenced October 1, 1948), and the last writing is dated December 23, 1952. Defendant discovered these writings two years later, on December 22, 1954. He asserts that when he confronted plaintiff with them she admitted they were written by the named corespondent, and also admitted that the corespondent is the father of the twins. Defendant left plaintiff the following day. After the action had been instituted, a '' notice to admit '' the receipt of this correspondence was served on plaintiff. She denied receiving them (except for a postcard, which is not incriminating). A similar '' notice to admit '' was served on the named corespondent. He refused to admit or deny writing or sending the correspondence and invoked the United States and New York State Constitutions, upon the ground that the '' demands called for might tend to incriminate '' him.

The relevancy of the blood grouping tests is disputed by the parties. Plaintiff's attorney and the corespondent's attorney in opposing affidavits urge that defendant and plaintiff have continuously lived together during the period of gestation of the twins and for more than five years thereafter; that defendant accepted the children as his own, has never questioned his paternity, and that this constitutes laches, which should bar defendant from obtaining the relief sought. It is also urged that no envelopes were produced and that there is no proof that plaintiff was the addressee of the communications or that they are in the handwriting of the named corespondent.

Plaintiff in an opposing affidavit states that the exhibits are a manufactured fabrication, and the charges based thereon were made in retaliation for the separation action she instituted.

A special guardian appointed for the children opposed the application on the ground that the authenticity of the letters is a great " mystery ", and although the letters " suggest lewdness " they are insufficient to form a basis upon which the granting of the motion would be justified.

Plaintiff, the corespondent, and the special guardian invoked the presumption of legitimacy as a ground for the denial of the motion.

We need not be concerned with the question of the court's power in a proper case to order blood grouping tests in actions where the legitimacy of a child born during wedlock is in issue. That question has been settled by *Kwartler* v. *Kwartler* (291 N. Y. 689), wherein it was held that the Supreme Court has such power under section 306-a of the Civil Practice Act in an action for divorce.

The questions here presented are: (1) whether the blood tests are relevant to the prosecution or defense of the action; (2) whether the fact that the parties had been living together continuously since the birth of the twins, and for a period of five years thereafter, precludes defendant from asserting the claim of illegitimacy because of laches, and (3) whether the fact that defendant and plaintiff lived together during the period of gestation created a conclusive presumption of legitimacy.

The complaint in the case at bar alleges that the twins are issue of the marriage. A judgment containing a provision for their support is part of the relief sought by plaintiff in her action for separation. Defendant denies paternity. Irrespective of who will prevail, a provision for the support of the twins will be an integral part of the judgment. Defendant's obligation to support the twins depends upon his paternity. Obviously, the blood grouping test cannot be irrelevant to the prosecution or defense of this action within the meaning of the above section. Moreover, the application for the blood tests may be justified in view of the contents of the correspondence, which the special guardian describes as expressing " words of endearment and even suggest[ing] lewdness " and which, in our opinion, indicate the existence of meretricious relationship between plaintiff and the corespondent over a long period of time, including the period of gestation.

There is no validity to the claim of laches. Defendant alleges that he discovered the revealing correspondence on December 22, 1954, and left his home the following day.

It is urged that the presumption of legitimacy resulting from the fact that plaintiff and defendant lived together during the period of gestation requires a denial of the motion.

Reason and logic, as well as a recognition of the modern advances in science, compel a determination that the presumption of legitimacy is not conclusive but rebuttable. The probative value of the results of skillfully conducted blood grouping tests has been widely accepted. The tests of course will be relevant only if they show noncompatibility as between the blood of defendant, the plaintiff, and the twins. If so, such evidence should be deemed conclusive as to nonpaternity.

In *Beach* v. *Beach* (114 F. 2d 479) a wife brought an action for maintenance on the ground she was pregnant by defendant, her husband, who denied paternity and counterclaimed for divorce on the ground of adultery. The husband sought a blood grouping test pursuant to subdivision (a) of rule 35 of the Rules of Civil Procedure (U. S. Code, tit. 28), which provides that in an action in which the mental or physical condition of a party is in controversy, the court may order the party to submit to a physical or mental examination by a physician. The application was granted, and the sole question on appeal was whether the court was authorized to make the order. In affirming, the Court of Appeals for the District of Columbia said (p. 482): "Appellee offers his denial of paternity in support of his demand for blood tests. He thereby asserts, by necessary implication, that the blood groupings of appellant and her child are or may be inconsistent with his paternity. Appellant, on the other hand, asserts appellee's paternity and thereby denies, by necessary implication, that the blood groupings in question are or may be inconsistent with it. As this conflict underlies the issue of paternity, we think the groupings are ' in controversy ' within the meaning of Rule 35 (a).

" Our construction of Rule 35 (a) is aided by the deference we owe to the views of the District Court, and by the direction in Rule 1 to construe the rules so as to secure a just result. If the child is appellee's, the tests will prove nothing and harm no one. If the child is not his, it would be unjust to prevent him from proving the fact. The historic restrictions on testimony to ' non-access ' are an added reason for admitting this evidence, which is independent of access."

In *Clark* v. *Rysedorph* (281 App. Div. 121), the Third Department, in December, 1952, dealt with this subject in a paternity proceeding. The court discussed the results of blood grouping tests conducted by Dr. Wiener, of Brooklyn, and Dr. Clemmer,

of Albany, both highly respected authorities on the subject of blood tests, whose findings, as a result of separate tests, definitely established the defendant's nonpaternity. The court stated (p. 123): "The principle underlying blood tests is that certain characteristics or properties of the blood of a parent perpetuate themselves in that of his or her offspring in accordance with the Mendelian Law, and that the results of such tests are relevant in the determination of whether a given child is the offspring of a specified adult or whether a given adult is the mother or father of a particular child." In speaking further of the medical testimony, the court said (p. 124): "The testimony of Drs. Wiener and Clemmer definitely establishes that respondent could not possibly be the father of the child in question. Their evidence is uncontradicted and is conclusive as to nonpaternity. To reject such testimony is to ignore scientific facts. This we may not do."

In a similar proceeding in the First Department in June, 1950 (*Commissioner of Welfare of N. Y.* v. *Costonie,* 277 App. Div. 90, 91) the court, in a *Per Curiam* opinion, commenting on the conclusiveness of the blood test findings, said:

"While we think that a blood test exclusion report is something more than an opinion, the weight that should be given to it depends upon the evidence adduced in its support. If, as appellant contends, it is a scientifically established and accepted fact that an exclusory finding is conclusive as to nonpaternity, it should be recognized and given effect. In such case the courts should accept the decisiveness of a nonpaternity finding properly arrived at as it would accept the demonstrable fact that a mixture of blue and yellow colors will produce varying shades of green, but never a red color.

"Although the question has been before the courts many times with varying results, it appears that the only State in which the problem was presented to the highest court of the State is Maine, which has a statute similar to ours (*Jordan* v. *Mace,* 69 A. 2d 670). In that case the court held that biological laws were not to be ignored and that where exclusion of paternity was definitely established by blood-grouping tests, the finding of nonpaternity was binding upon the jury unless it found that the tests had not been properly made."

In most of the reported cases in this State, so far as the record discloses, where a blood test had been ordered to determine paternity, it appeared that the husband had lived apart from the wife during the period of gestation. However, in the case at bar the husband and wife were living together in con-

jugal relationship during the entire period of gestation, and continuously thereafter up to December, 1954. It is strongly urged that the presumption of legitimacy should be deemed conclusive under these circumstances.

The artificially erected presumption of legitimacy was once considered as one of the strongest and most persuasive known to the law. As stated by Judge CARDOZO in *Matter of Findlay* (253 N. Y. 1, 7–8), there was a time when its rank was so high that "If a husband, not physically incapable, was within the four seas of England during the period of gestation, the court would not listen to evidence casting doubt on his paternity." In referring to the rule of the "four seas" it was stated in *Rex* v. *Luffe* (8 East 193, 208 [1807]) that it "has been long exploded on account of its absolute nonsense". Judge CARDOZO pointed out that the presumption of legitimacy, like other presumptions, is now subject to rebuttal; that the old formula has yielded with the years to one more natural and supple; that while there are survivals of the rule of "olden days", the courts have, by and large, generally agreed that contrary evidence may shatter the presumption of legitimacy "though the possibility of access is not susceptible of exclusion to the point of utter demonstration."

There is no doubt that with the passing of years and the advance of science the age-old concept has gradually given way to the sway of reason, and that the presumption of legitimacy has been withering and shrinking in the face of scientific advances. (*Hynes* v. *McDermott*, 91 N. Y. 451, 459; *Matter of Matthews*, 153 N. Y. 443; *Matter of Findlay, supra.*) Presumptions are looked upon " ' *   *   * as the bats of the law, flitting in the twilight but disappearing in the sunshine of actual facts.' " (*Mockowik* v. *Kansas City, St. Joseph & Council Bluffs R. R. Co.*, 196 Mo. 550, 571.) It cannot be gainsaid that we have now reached the point where presumptions must yield to modern scientific facts.

While we do not hold that blood grouping tests should be granted on an application of an alleged father, based on mere suspicion, we are of the opinion that the unusual circumstances presented in the case at bar warrant the granting of this application. However, as the results may be used only to exclude paternity, a purpose that here concerns only the husband, it would be futile to direct the corespondent to submit to the test.

The order should be modified by providing that the motion be granted as to the plaintiff, the defendant, and the twins, that it be denied as to the corespondent, and that defendant shall

bear the expense of the tests. As so modified, the order should be affirmed, without costs.

NOLAN, P. J., WENZEL, MURPHY and UGHETTA, JJ., concur.

Order modified by providing that the motion be granted as to the plaintiff, the defendant, and the twins, that it be denied as to the corespondent, and that defendant shall bear the expense of the tests. As so modified, order affirmed, without costs.