S.A., Appellant,

v.

M.A., Appellee.

No. 86–327.

District of Columbia Court of Appeals.

Argued June 2, 1987.
Decided Oct. 6, 1987.

---

Judith L. Gorfkle, Washington, D.C., for appellant. Robert A. Johnson, Washington, D.C., also entered an appearance for appellant.

Jane Moretz Edmisten, Washington, D.C., for appellee.

Before PRYOR, Chief Judge, and MACK and STEADMAN, Associate Judges.

MACK, Associate Judge:

Appellant/husband seeks review of a December 12, 1985 order of the Family Division of the Superior Court. In that order, the trial court (1) found that appellant was the natural father of the third and last child born of appellee/wife; (2) ordered appellant to make contributions of $779 per month for the support of his three children; and (3) declared appellant current on all payments due under previous child support orders of the Superior Court. Appellant raises several arguments on appeal. First, he contends that the finding of paternity was clearly erroneous and that the court abused its discretion in refusing to order a Human Leukocyte Antigen (HLA) test. Second, he argues that the level of support contributions he was ordered to pay is based on a clearly erroneous determination of his ability to pay and a commensurate erroneous determination of his wife's inability. And finally, he contends that the issue of arrearages from prior support orders was not properly before the court, and, in any event, the court's failure to award him a credit for past overpayments was clearly erroneous. Finding no error, we affirm.

I.

Appellant and appellee were married on October 1, 1971, in Washington, D.C. On or about March 31, 1974, the parties separated, but continued to engage in intermittent conjugal relations at least every two months through January, 1985. They were not divorced as of the date of the November 19, 1985 hearing in this matter.

Three children were born of this marriage: B., S., and N. Appellant acknowledges parentage of B. and S., but denies he is N.'s father. N. was born on August 10, 1979, and appellant concedes that he and his wife engaged in conjugal relations during the first week in November, 1978—the presumptive period of conception.

In 1974, after the parties' separation but at a time when only two children were born, the court ordered respondent to pay $90, bi-weekly, and $118 of his Veteran's Administration benefits, monthly, for the support and maintenance of appellee and the two children. In May, 1985, appellant requested a financial review before a hearing commissioner to clarify the status of his support payments. Appellee, in response, moved for an increase in support. On June 19, 1985, the commissioner entered a *pendente lite* order in which appellant agreed to pay, and appellee agreed to accept, $500 per month in support of the two older children. During the *pendente lite* hearing, appellant first denied his paternity of N.

Following unsuccessful negotiations on the issues of arrearages, support payments, and paternity, a hearing was held on November 19 and 20, 1985. Before the court were the parties' joint motions to determine arrears, appellant's motion to decrease child support, and appellee's motion to increase child support. Early in the first day of the proceedings, the court determined that the paternity of N. was not in issue since appellee never amended her petition to request support for N. On the second day, however, the court reversed itself and determined that the adjudication of paternity in a separate proceeding would be inappropriate and inefficient. Appellant consented to the court's request to place paternity in issue. The resultant order is the subject of this appeal.[1]

---

1. Prior to the June 19, 1985, *pendente lite* hearing, appellant filed a complaint for an absolute divorce in which he alleged that three children were born of the marriage. Following the hearing, appellant withdrew the complaint. On August 16, 1985, appellant filed a second complaint for absolute divorce alleging his paternity of only the two oldest children. That complaint was not before the trial court in the November

19, 1985 hearing. This court is now possessed of information which shows that in a consensual separation and property settlement agreement filed on March 20, 1987, in the Superior Court, appellant again made representations indicating his paternity of N. Despite appellant's on-again, off-again representations of paternity, we do not deem the issue waived and thus address it here.

## II.

## PATERNITY

The trial court explicitly found that appellant was the "natural father" of N. Of course, we recognize that the paternity of a child is a question of fact peculiarly within the province of the factfinder. *Minor v. District of Columbia,* 241 A.2d 196, 196 (D.C.1968); *Hawkins v. District of Columbia,* 203 A.2d 116, 116–17 (D.C.1964). Unless a trial court's finding of paternity is "clearly erroneous," or otherwise not in accordance with the law, Super.Ct.Dom. Rel.R. 52(a); *see Ashley v. Ashley,* 179 A.2d 905, 906 (D.C.1962), we are not in a position to disturb the trial court's ruling. Here, the trial court's finding of paternity is neither clearly erroneous nor otherwise contrary to law.

### A.

■ The starting point for the trial court's analysis and for our analysis is the recognition of the fact of marriage between the two parties at the time of the conception and birth of N. Thus, while a woman has the burden of proving a man's paternity by a preponderance of the evidence, *Johnson v. District of Columbia,* 271 A.2d 563, 564 (D.C.1970); *see Rivera v. Minnich,* — U.S. —, 107 S.Ct. 3001, 97 L.Ed.2d 473 (1987) ("preponderance of the evidence" standard in paternity suits does not violate putative father's due process rights), a child's birth during the marriage of a woman and a man raises a statutory presumption that the husband is the father. D.C.Code § 16–909(a)(1) (1981).

The importance of this statutory presumption is highlighted by reference to the common law: "The presumption of legitimacy of a child born in wedlock has always been considered one of the strongest known to the law." *Peters v. District of Columbia,* 84 A.2d 115, 118 (D.C.1951); *see* S. GREEN & J. LONG, MARRIAGE AND FAMILY LAW AGREEMENTS § 5.22 (1984). Of course, contrary to old common law principles, the "legitimacy" of a child no longer depends upon the marital status of the parents. "The term 'legitimate' or 'legitimated' means that the parent-child relationship exists for all rights, privileges, duties, and obligations." D.C.Code § 16–907(a) (1981). "A child born in wedlock or born out of wedlock is the legitimate child of its father and mother...." *Id.* § 16–908. Nevertheless, the state and its children retain a strong interest in maintaining the presumption of the parent-child relationship of a child born in wedlock.[2]

Given the strong interests in the preservation of the parent-child relationship, the

2. Of course, the state also has a substantial interest in the accurate determination of paternity. Moreover, a man's interest in not incurring support obligations for a child not his own cannot be gainsaid. However, a child's interests in the results of an "in wedlock" paternity action are distinct from his or her interests in the results of an out-of-wedlock paternity action. When a child is born out-of-wedlock, either the mother or the state (over the objection of the putative father) or the putative father (over the objection of the mother) attempts to *establish* a father-child relationship between the child and the putative father. A father-child relationship has often not yet developed. *See, e.g., District of Columbia v. J.R.M.,* 521 A.2d 1152 (D.C.1987) (paternity action against putative father); *District of Columbia ex rel. W.J.D. v. E.M.,* 467 A.2d 457 (D.C.1983) (paternity action against putative father); *Cutchember v. Payne,* 466 A.2d 1240 (D.C.1983) (paternity action against putative father); *In re Mengel,* 287 Pa.Super. 186, 429 A.2d 1162 (1981) (putative father sought declaratory judgment of his paternity over child). By contrast, in a contested paternity action in a marital context, a husband or wife attempts to *sever* a presumed father-child relationship between the child and the husband. Furthermore, a father-child relationship may already be in place. Careful consideration of a child's interests must be accorded. Indeed, were a remand in this case necessary because of inadequate findings or otherwise, a guardian ad litem would very likely be necessary to protect the child's interests.

Additionally, the interests at stake in the current proceeding are distinct from those in which a married woman seeks to adjudicate paternity against a man not her husband, *District of Columbia v. Prather,* 207 A.2d 119 (D.C.1965); *Peters, supra,* or a paramour seeks to establish his paternity as against the husband of the mother. *Happel v. Mecklenburger,* 101 Ill.App.3d 107, 56 Ill.Dec. 569, 427 N.E.2d 974 (1981). There, the object of the inquiry is the establishment of the true parent-child relationship. Of course, even in that context, due consideration must be given the child's interests and the possible historical relationship between the child and the husband.

presumption of husband's paternity of a child born in wedlock was formerly irrebuttable. *Peters, supra,* 84 A.2d at 118; *see Retzer v. Retzer,* 161 A.2d 469, 470 (D.C.1960). In view of the harshness of such a rule, however, the presumption is clearly now rebuttable. *Harrington v. Harrington,* 145 A.2d 121, 122 (D.C.1958); *Peters, supra,* 84 A.2d at 118. As one court has aptly noted, the practical effect of the "rebuttable presumption" rule in marital contexts, "is to place the burden of proving nonpaternity on the putative father." *In re Marriage of Schneckloth,* 320 N.W.2d 535, 536 (Iowa 1982). Indeed, this court has implicitly recognized such an effect in holding that it is a husband's burden to rebut the presumption of his paternity by "a proper and sufficient showing of nonpaternity." *See Retzer, supra,* 161 A.2d at 471.

■ Proof of "impotency, complete absence, absence during the period of conception, and presence but with clear proof of the lack of sexual intercourse" are sufficient to rebut the presumption of paternity. *Id.* at 470; *Peters, supra,* 84 A.2d at 118–19. Moreover, a blood grouping or HLA test which excludes a putative father as the biological father is sufficient to rebut the presumption and indeed is conclusive evidence of nonpaternity. *Retzer, supra,* 161 A.2d at 472.

In this case, appellee's prima facie case of her husband's paternity was very strong. Not only did the statutory presumption of appellant's paternity operate, but both parties conceded sexual relations during the presumptive period of conception. *See Cutchember v. Payne, supra* note 2, 466 A.2d at 1242 ("access remains of critical significance"). Moreover, appellee testified under oath that she engaged in no other sexual relations during the relevant time. Finally, appellee introduced documentary evidence and testimony regarding appellant's six year history of representations of his paternity of N. and treatment of N. as his child. The statutory presumption of paternity clearly was not the only, nor even the decisive factor in the trial court's determination of paternity.

■ To rebut appellee's very strong prima facie case, appellant made two allegations. First, he alleged that N. did not resemble him. The trial court implicitly, and properly, refused to consider this evidence. Appellant's naked assertion of nonresemblance, in the absence of any proffer of "striking or peculiar non-resemblance," could not properly be used as evidence to rebut paternity. *Hassler v. District of Columbia,* 122 A.2d 827, 829 (D.C.), *rev'd on other grounds,* 99 U.S.App.D.C. 188, 238 F.2d 264 (1956); *cf. Thomas v. United States,* 74 U.S.App.D.C. 167, 172, 121 F.2d 905, 910 (1941) ("fact of resemblance can have no evidentiary value unless there appear in the child physical characteristics peculiar to the father and unless the resemblance is so striking as to leave no reasonable doubt as to its existence").

■ Second, appellant asserted that his wife confessed to an adulterous, one-night affair some time around the period of conception. Appellant stated that in December, 1978, his wife indicated to him that the father of the child she was carrying was a man with whom she had traveled to North Carolina one weekend. To rebut appellant's allegation, appellee testified in detail to the date and events of the weekend in question. She denied appellant's allegation of adultery and her so-called confession to it shortly thereafter. She offered to call as a witness the woman with whom she had traveled to corroborate her story.[3]

3. The following colloquy took place between the court and appellee:
APPELLEE: I know the weekend he is referring to. He mentioned it earlier this year [and it] is the first I've heard it mentioned since. There was a man with me. He was not my date. I did not sleep with him. There was also a woman with me. He was not her date. We went to visit—it was December 2nd. It was for her birthday. It was a friend who was an attorney in North Carolina in the military as he [appellant] said in North Carolina and an attorney. We went down for a birthday party for her. The man was crazy. I told him [appellant] what a horrible weekend it was. We put him [the man] on a bus so he went home. I would not allow him to ride back in my car. I did not sleep with the man. Neither did any of the other women there. He just—we hadn't known him long

The trial court explicitly discredited the husband's allegation:

> The Court does not credit [appellant's] testimony that [appellee] reported her pregnancy on December 4, 1978, confessing that it resulted from an out-of-town adulterous one-night stand with another man, less than a week earlier.

Since the trial court is in the best position to observe and assess witness demeanor, voice, and mannerism, its determination of credibility will rarely be disturbed by this court. *Lindsay v. District of Columbia ex rel. Lindsay*, 298 A.2d 211, 212 (D.C.1972); *District of Columbia v. Stovall*, 253 A.2d 541, 542 (D.C.1969). Nothing in this record justifies a rejection of the trial court's credibility determination. *See* note 3, *supra.*

Appellant made no other proffer of nonpaternity. He offered no corroborative evidence nor unbiased testimony of an alternative source of paternity. *Cf. Retzer, supra*, 161 A.2d 469 (evidence showed that at the time of conception, wife was living in apartment rented for her by another man, other man was seen visiting wife on a number of occasions, and wife misrepresented to landlord other man's name as her married name). Since appellant conceded sexual relations with his wife during the relevant time period, he made no proffer of "impotency, complete absence, or absence during the period of conception." *See id.* at 470; *Peters, supra*, 84 A.2d at 118–19.

In light of the evidence, appellant clearly failed to make a "proper and sufficient showing of nonpaternity," and thus the trial court's determination of appellant's paternity was not clearly erroneous if it was otherwise in accordance with the law.

## B.

Appellant argues, however, that the finding of paternity is not otherwise in accordance with the law since the trial court improperly refused to order HLA testing. Since exclusionary results of blood grouping or HLA tests satisfy a husband's burden to rebut paternity, *Retzer, supra*, 161 A.2d at 472, appellant argues that the trial court erred in failing to require the testing.[4]

and he had just come along and— ... —as soon as I heard all this, the friend who was with me is absolutely outraged and offered to come into Court to testify.

\* \* \* \* \* \*

COURT: So you did not tell him that—did you call him in December of '78 and say you were pregnant?

APPELLEE: Yes, that I thought I was pregnant and December 15th is when I got the test results.

COURT: And that was when you called him?

APPELLEE: It was in December. I don't know when. I called him from class because I was upset and I said "[husband's name], I think I'm pregnant." No, it was before I got the test results. It was when I first started *thinking* it and I was *sitting in class* and started brushing my chest and breasts felt tender and all the things felt—anyway, I called him long before I even knew for sure.

\* \* \* \* \* \*

COURT: ... In 1978 or 1979, did you discuss or report or tell [appellant] about someone else whom you had slept with?

APPELLEE: No, Your Honor.

COURT: And do you recall when the first time [appellant] spoke to you about any doubts that he might have had about his being N.'s father?

APPELLEE: No, but Your Honor, he has done that with all three of the children all of their lives basically. From the beginning, he has challenged and questioned every one of them and none of them were his at some time or another depending on his mood.

4. Normally, a party seeking blood grouping or HLA tests would be required to file a written motion "at least 15 days prior to the scheduled hearing date on the contested calendar, unless leave to file such motion is otherwise granted by the Court upon a showing of good cause." Super.Ct.Dom.Rel.R. 405(f). Appellant did not file such a motion and the record discloses that, at the beginning of the proceedings on November 20, 1985, when appellant consented to the trial court's decision to include paternity as a contested issue, he failed to move for HLA testing. Indeed, as the trial court found, appellant did not formally request HLA testing until the close of the proceedings. Appellant's counsel stated: "I would also like the record to reflect that we would have to have HLA's." After the court's questioning on the subject, appellee stated that she did not want HLA testing. In its final order, the court applied a quasi-waiver theory in rejecting appellant's request. Here, however, since paternity was not put in issue until midway through the proceedings, appellant's failure to request HLA testing at an earlier point does not act as a waiver of his claim.

The trial court's partial reliance on a waiver theory, however, does not preclude us from reviewing its decision not to compel HLA testing. The trial court ultimately exercised inde-

The statute which governs HLA and blood testing provides in relevant part:

(a)(1) When the [Family] Division has jurisdiction of actions or proceedings under section 11–1101, the court, on its own motion or on the motion of a party, *may* require the child, the mother, an alleged parent, or the other parent to submit to medical, genetic blood or tissue grouping tests.

(2) The tests may include the human leukocyte antigen test.[5]

D.C.Code § 16–2343(a) (1987 Supp.) (emphasis added).

It is by now well-settled that compelling an individual to submit to an "intrusion[ ] into the human body," such as the tests enumerated in § 16–2343(a), implicates Fourth Amendment interests in personal privacy and dignity. *Schmerber v. California*, 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). As Judge Walton of the Superior Court has noted, in light of the Fourth Amendment interests at stake, the constitutionality of D.C.Code § 16–2343(a) (1987 Supp.) is preserved by the discretionary nature of the exercise of the power to compel testing. *District of Columbia ex rel. M.L.D. v. W.H.*, 113 Daily Wash.L.Rptr. 2185 (September 25, 1985). Indeed, in most other jurisdictions, the power to compel blood grouping and HLA tests is discretionary. *E.g., Barlow v. Guerrera*, 9 Conn.App. 431, 431, 519 A.2d 623, 623 (1987); *Symonds v. Symonds*, 385 Mass. 540, ——, 432 N.E.2d 700, 704 (1982);

*Happel v. Mecklenburger, supra* note 2, 101 Ill.App.3d at 113, 56 Ill.Dec. at 575, 427 N.E.2d at 980. Therefore, we can reverse only upon a finding that the trial court abused its discretion in failing to compel appellee and N. to submit to HLA testing.

In *Schmerber*, the Supreme Court upheld the forced extraction of blood from an individual suspected of driving while intoxicated. "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." *Schmerber, supra*, 384 U.S. at 768, 86 S.Ct. at 1834. The intrusion in *Schmerber* was "justified in the circumstances" because the officer's arrest of Schmerber was based upon probable cause. *Id.*

This court and other courts recognize that the privacy and bodily integrity interests described in the criminal context of *Schmerber* apply with equal force to compulsory blood testing in other contexts, including paternity and divorce proceedings. *See Beckwith v. Beckwith*, 355 A.2d 537, 545–46 (D.C.1976) (divorce proceeding on grounds of adultery), *appeal after remand*, 379 A.2d 955 (D.C.1977), *cert. denied*, 436 U.S. 907, 98 S.Ct. 2239, 56 L.Ed.2d 405 (1978); *Peterson v. Peterson*, 402 N.W.2d 847, 848 (Minn.App.1987); *Commonwealth v. Beausoleil*, 397 Mass. 206, 221–25, 490 N.E.2d 788, 798–99 (1986); *State ex rel. McGuire v. Howe*, 44 Wash.

---

pendent discretion in determining that HLA testing would be inappropriate. The court stated: "Under all the circumstances of this case, and bearing in mind the best interests of the child, the Court, in its discretion, chose not to order the tests on its own motion." Since the court made extensive and detailed findings of fact on the question of paternity, the "circumstances of the case" which the court referred to are readily apparent from the face of the order. Thus, we are not confronted with a situation in which insufficient or incomplete findings of fact compel us to remand for further findings on the basis of the trial court's discretionary decision not to compel HLA testing. *See* Super.Ct.Dom. Rel.R. 52(a) ("the Court shall ... set forth the findings of fact and conclusions of law which constitute the grounds of its action"); *Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979) (exercise of discretion should be accompanied by a "specific factual predicate" so that an ap-

pellate court can determine whether the exercise of discretion was rationally based); *Morgan v. Foretich*, 521 A.2d 248 (D.C.1987) (case remanded for further findings on trial court's discretionary decision not to open contempt proceedings in visitation rights case to public).

5. As this court has previously noted, "rather than being a 'blood test,' an HLA test is in actuality a 'tissue test.'" *Cutchember v. Payne, supra* note 2, 466 A.2d at 1242. Although HLA tests are more sophisticated than blood grouping tests, blood is the most convenient medium for evaluating the relevant factors. Of course, the intrusion upon an individual is the same in both HLA and blood grouping tests: a sample of blood is extracted by use of a needle. Therefore, reference in this opinion to "blood testing" includes HLA testing.

App. 559, 564, 723 P.2d 452, 455 (1986). In *Beckwith*, this court sustained a trial court's decision to compel a child to submit to blood testing for the purposes of determining possible adultery as the basis of the husband's complaint for divorce. Rejecting the child's asserted right to privacy claim, the court found that the intrusion was carried out in a reasonable manner and was "reasonable under the circumstances." [6] *Beckwith, supra*, 355 A.2d at 545; *see also District of Columbia ex rel. M.L.D. v. W.H., supra*, 113 Daily Wash.L.Rptr. at 2189 (applying "reasonable under the circumstances" test); *cf. District of Columbia v. J.R.M., supra* note 2, 521 A.2d at 1155 (default as to paternity may be entered if putative father *"unreasonably* refuses to take the HLA test") (emphasis added).

Other courts have fashioned similar tests. In paternity proceedings involving children born out-of-wedlock, a putative father's objection to blood testing will typically be rejected if there is "probable cause" to believe that the putative father engaged in sexual relations with the mother, *Commonwealth v. Beausoleil, supra*, 397 Mass. at 221, 490 N.E.2d at 798, or "prima facie evidence" of the requisite sexual contact, *Schenectady County Department of Social Services ex rel. Maureen "E" v. Robert "J"*, 126 A.D.2d 786, ——, 510 N.Y. S.2d 289, 291, *appeal dismissed*, 69 N.Y.2d 1038, 511 N.E.2d 90 (1987), or a "reasonable possibility" of requisite sexual intercourse. *State ex rel. McGuire v. Howe, supra*, 44 Wash.App. at 562, 723 P.2d at 454 (citing Wash.Rev.Code § 26.26.100). In some jurisdictions, a complaint by the mother alleging sexual contact during the presumptive period of conception constitutes "probable cause" or "prima facie evidence." *Commonwealth v. Beausoleil, supra*, 397 Mass. at 221–25, 490 N.E.2d at

798–99. In others, the mother must submit a sworn affidavit of requisite sexual contact. *Schenectady, supra*, 126 A.D.2d at ——, 510 N.Y.S.2d at 291; *Bowerman v. MacDonald*, 157 Mich.App. 368, 373, 403 N.W.2d 140, 143, *appeal granted* —— Mich. ——, 409 N.W.2d 200 (1987).

Even in out-of-wedlock contexts, however, a mother's request to compel a putative father to submit to HLA testing is not subject to automatic court approval. *District of Columbia ex rel. M.L.D. v. W.H., supra*, 113 Daily Wash.L.Rptr. 2185. As Judge Walton noted in *M.L.D. v. W.H.*, under normal circumstances, a mother's complaint or affidavit of sexual relations with the putative father during the presumptive period of conception is ordinarily sufficient to compel a putative father to submit to HLA testing. *See id.* at 2189; *cf. District of Columbia v. Prather, supra* note 2, 207 A.2d at 120 ("[i]f the testimony of the complaining witness is credible, sufficiently clear and convincing, it need not be corroborated" before entry of the final order of paternity). But, in *M.L.D. v. W.H.*, unique circumstances convinced Judge Walton that compelled HLA testing of the putative father was not reasonable. The only proof of paternity was the allegation of the mother, whose credibility was extremely questionable. Additionally, the mother and putative father had been divorced for two years preceding the child's birth; the mother had named a different man as the father on the child's birth certificate; for over three years after the child's birth, the mother made public representations—some under penalty of fraud— that the man named on the birth certificate was the father. Furthermore, the mother admitted sexual relations with other men at the time of conception. Finally, the putative father denied sexual contact. Under the totality of those circumstances, Judge

---

**6.** Paternity and legitimacy were not at issue in *Beckwith*. Nevertheless, *Beckwith* contains some categorical language about blood grouping tests in paternity actions which must be read in context. Thus, while the *Beckwith* court asserts that "[t]hose courts that have considered ... constitutional challenges to the ordering of blood grouping tests in matters involving paternity have uniformly rejected them," *Beckwith*,

*supra*, 355 A.2d at 545, it must be remembered that in the majority of contested paternity suits, the facts are such that interests of the moving party or parties in the results of blood testing simply outweigh the non-moving party or parties' asserted privacy interests. Thus, rather than not existing, the constitutional claim of privacy in those cases yielded reasonably to other interests.

Walton determined that compelling the putative father to submit to blood testing was not reasonable.

Of course, for children born out-of-wedlock, a putative father's request for blood grouping or HLA tests will ordinarily be granted over a mother or child's objection. Without a statutory presumption of paternity or a history of treatment of a child as one's own, a putative father's due process rights in the results of a test which would positively exclude him from paternity would almost always outweigh the privacy interests of a mother and child. *See Elzey v. Smith,* 412 So.2d 918 (Fla.Dist.Ct.App. 1982) (trial court abused its discretion in denying putative father's motion for HLA testing over objection of mother).

And indeed, "under reasonable circumstances," a wife and child can be compelled to submit to testing upon request by a husband contesting paternity in the context of a divorce or support proceeding. However, as one court has aptly noted, "more than a 'mere suspicion' of nonpaternity must be shown." *Golser v. Golser,* 115 A.D.2d 695, 698, 496 N.Y.S.2d 521, 524 (1985) (citing *Anonymous v. Anonymous,* 1 A.D.2d 312, 318, 150 N.Y.S.2d 344, 350 (1956)). Additionally, a husband's treatment of a child as his own from the time of conception through his first official challenge to paternity may operate to either estop him entirely from the claim of nonpaternity, or, in combination with other factors in the case, render his request for HLA testing unreasonable under the circumstances.

In this case, appellant's proffer of nonpaternity amounts to no more than "mere suspicion." His nonspecific, bald allegation of non-resemblance to the child is entitled to no credit. *Hassler v. District of Columbia, supra,* 122 A.2d at 829. His allegation of an adulterous, one-night affair between his wife and another man was uncorroborated by any independent evidence or unbiased testimony. Moreover, his allegation was flatly refuted by his wife and completely discredited by the trial court. *See* note 3, *supra,* and accompanying text.

The untimeliness of appellant's disavowal of paternity severely undercuts the credibility of his claim and operates, at a minimum, as a factor in assessing the reasonableness of ordering HLA testing in this case. The court found that appellant first denied paternity on June 19, 1985—almost six years after N.'s birth. Indeed, only two months earlier, in a sworn complaint for absolute divorce, appellant claimed to be N.'s father.

Moreover, throughout N.'s first six years, appellant consistently affirmed his parentage of N. and treated N. as his child: when N. was born, appellant added N. as a dependent covered by his health benefits; with appellant's knowledge and consent, appellant was named as N.'s father on N.'s birth certificate; in recognition of N.'s arrival, appellant voluntarily increased his child support payments; in his dealings with N., appellant always referred to himself as "Daddy," and N. knew appellant, and appellant only, as "Daddy"; N.'s name and birthdate was placed on appellant's list of immediate family members' birthdays; appellant always exercised unlimited visitation rights with N. in the same manner as the two older children. Thus, for over six years, and on numerous occasions in which appellant could presumably be prosecuted for fraud for providing false information, appellant represented his parentage of N. *Cf. M.L.D. v. W.H., supra,* 113 Daily Wash. L.Rptr. at 2189 (for over three years and on numerous occasions in which she could have been prosecuted for fraud, mother represented that a man other than the defendant in the paternity action was the father). Appellant's longstanding public representations of paternity give rise to a strong inference that appellant's belated allegation of nonpaternity is, at best, a "mere suspicion," and, at worst, an attempt to circumvent his support obligations.

■ Indeed, appellant's history of admissions of paternity and behavior toward the child as "Daddy" could well operate to equitably estop appellant from denying parentage. *See Fuller v. Fuller,* 247 A.2d 767, 769 (D.C.1968), *petition for review denied,* 135 U.S.App.D.C. 353, 418 F.2d

1189 (1969). Moreover, equitable estoppel can be raised as a defense to a request for blood testing. *Golser v. Golser, supra,* 115 A.D.2d at 698, 496 N.Y.S.2d at 524. The trial judge, however, did not rely on estoppel in her order of paternity and her decision not to compel HLA testing.[7] Therefore, despite the potential applicability of estoppel to the facts of this case, we do not rely on that doctrine to affirm the trial court's ruling. Rather, given the trial court's obvious reliance on the longstanding father/child relationship between appellant and N., we consider such a history one factor in determining the reasonableness of a request for an order of HLA testing.

■ Discretionary decisions by trial courts to deny motions to compel HLA testing of wives and children have been upheld in numerous cases. While undue reliance on these cases would be inappropriate given the different surrounding circumstances, it is clear that courts give careful consideration of the distinct factors which operate in a marital context before compelling blood testing of a spouse and child. *See Nacey v. Nacey,* 124 A.D.2d 396, 507 N.Y.S.2d 841 (1986) (in an appeal after a remand which ordered the taking of further evidence to support the trial court's discretionary refusal to compel a wife and child to submit to blood testing (*Nacey v. Nacey,* 116 A.D.2d 933, 498 N.Y.S.2d 231 (1986)), the findings on appeal now supported the trial court's determination that estoppel operated to defeat father's HLA request); *Jacob v. Jacob,* 417 So.2d 1367 (La.Ct.App.1982) (no abuse of discretion in refusing to compel blood testing since the husband's disavowal of paternity exceeded the 180–day statutory limitation on such disavowal); *cf. Peterson v. Peterson, supra,* 402 N.W.2d 847 (no abuse of discretion since husband's paternity had been previously decided by court order and husband made no showing that his sixteen year old child's physical or emotional health was endangered without biological test of paternity). Furthermore, in another case,

an order *compelling* a wife and child to submit to blood tests was vacated for the taking of further evidence of a wife's claim of estoppel, even though the husband denied paternity within three years of the birth of the child and the husband specified details of the wife's allegedly adulterous conduct. *Golser v. Golser, supra,* 115 A.D.2d 695, 496 N.Y.S.2d 521.

Our attention has been drawn to only one case in which a trial court has abused its discretion for denying a husband's motion for blood testing of his wife and child. The facts of that case are completely distinct from those present here. *See Anonymous v. Anonymous, supra,* 1 A.D.2d 312, 150 N.Y.S.2d 344 (husband's motion should have been granted since husband offered eight explicit writings between his wife and another man establishing an extramarital sexual relationship between the two during the time of the conception of their twin children; since husband alleged that upon confronting his wife with the writings, she confessed that the other man was the father; and since husband abandoned his wife and his claim of paternity of the twin children the day after his discovery of the writings indicating the adulterous affair). In one other case, an order denying a request for testing was vacated, but the basis of the vacation and remand was the inadequacy of the findings supporting the trial court's exercise of discretion, rather than a finding of an abuse of discretion. Moreover, the factual context of that case is distinct from that here. *See Symonds v. Symonds, supra,* 385 Mass. 540, 432 N.E.2d 700 (in husband's action for divorce and annulment based on wife's alleged fraudulent inducement to marry due to pregnancy, where husband denied paternity within eleven months of birth of child, judge's decision to deny testing on grounds that such tests were not admissible was clearly erroneous).

There can be no question that the results of HLA tests are normally "highly desir-

---

7. In a footnote, the court alluded to the possibility of estoppel as an alternative basis for appellant's support obligations: "Even if respondent had successfully rebutted the presumption of parentage, he might nevertheless have a duty to support the child under the doctrine of equitable estoppel, because he would then have misrepresented himself to the child as 'Daddy.'"

able" in making a factual determination of paternity. *See District of Columbia v. J.R.M.,* *supra* note 2, 521 A.2d at 1155. Indeed, in the great majority of contested paternity suits, a trial court exercising reasonable discretion would ordinarily grant a party's request for testing over the objection of the non-moving party. But, in the exercise of reasonable discretion, a trial court can decline to exercise its authority to compel individuals to submit to blood tests without thereby abusing its discretion. Faced, on the one hand, with an untimely, unsubstantiated, self-serving allegation of a wife's adulterous conduct as the only basis for a request for HLA testing, and, on the other hand, with a statutory presumption of paternity, requisite sexual contact, and a six year history of treatment of a child as one's own, the trial court's refusal to order appellee and N. to submit to blood tests clearly did not constitute an abuse of discretion.

### III.

### SUPPORT

██ Appellant next contends that the trial court erred in ordering support payments of $779 per month. Specifically, appellant argues that the court erroneously ordered appellant to "refinance his debts" and erroneously failed to compute appellee's potential, rather than actual, earnings. We find appellant's contentions without merit.

In determining an appropriate level of support, a trial court must balance the many factors surrounding the pecuniary situation of the husband and wife and the reasonable needs of the minor children. *See Smith v. Smith,* 344 A.2d 221, 223 (D.C.1975). A trial court's determination of the appropriate level of support is accorded due deference and will be reversed only upon a finding of an abuse of discretion. *Id.*

The trial court made meticulous findings of fact on the financial situations of appellant and appellee and on the reasonable needs of the three children. Contrary to appellant's assertion, he was not ordered to "refinance his debts," nor did the trial

court erroneously fail to consider his argument concerning appellee's ability to pay. After reviewing the record, we can fairly say that the trial court did not abuse its discretion in its order of support.

### IV.

### ARREARAGES

██ Appellant finally argues that the issue of arrearages was not properly before the court, and that, in any event, the court erred in failing to award him a credit for past overpayment of support. Since the calculation of arrearages was a purely factual matter upon which the trial court was presented with irrefutable evidence of no credit due appellant, any possible procedural error in the taking of appellant's evidence was clearly harmless.

██ By order dated October 11, 1974, and modified March 26, 1975, appellant was required to pay $90, bi-weekly, and $118 of his Veteran's benefits, monthly, for the support and maintenance of his wife and two children. In the order on appeal, the trial court determined that since that time, appellant had paid either directly to appellee or through the Court Registry approximately $32,380. The trial court then determined that the total amount appellant owed was approximately $36,500. Thus, appellant was not due a credit. Since appellee represented at the hearing that she would accept a determination of zero arrearages, the trial court adjudged appellant "current" on all payments.

Appellant does not, and indeed cannot, argue that the trial court erroneously determined that over the course of 11 years, he paid approximately $32,380 in child support payments. The $32,380 figure was based on representations and documentary evidence presented by *appellant* at the November 19, 1985 hearing which indicated that he had made somewhat more than $25,000 in direct payments. The trial judge, relying on court records of which she was entitled to take judicial notice, also determined that appellant had made some

$7,380 in payments through the Court Registry.

Nor does appellant challenge $27,770 of the total amount the trial court determined he owed. Indeed, any challenge to that amount would be frivolous, since simple multiplication of the court-ordered support contributions by the number of payments due nets the result.[8] The sole basis for appellant's argument that he is due a credit is the inclusion of $8,732 of Veteran's education benefits in the total amount due. Appellant argues on appeal that since he went to school for only three months in 1975, and since he was paid benefits for only those three months, the maximum amount includible is $354 (3 × $118).

The trial record, however, flatly refutes appellant's claim. In response to questioning from his own counsel, appellant indicated that his VA benefits did not terminate until 1981:

Q: Now, the VA benefits that you were ordered to pay, what was the amount that you were actually ordered to pay by Judge Atkinson?

A: I think if I remember correctly from reading the order that the—sometime with the Court, he stated I should pay half of the $118, which would have been $59. But the way it was typed, later on—last time, when the Court, which I think was February or March of '80—of '75, it stated $118.

Q: And what kind of benefits were these?

A: These were VA benefits on the GI bill for going to school.

Q: And how long were you in school? What was the period of time that you were in school?

A: I stopped in May of '75. I finished it—the semester out—and that was it.

Q: In May of '75?

A: May of '75.

Q: And that's when the VA benefits terminated?

A: *No. Actually, VA benefits terminated in '81*, ten years from the date I got out in the Marine Corps. *So they terminated actually, in '81.* [Emphasis added.]

Therefore, on the basis of appellant's own testimony, the court's inclusion of the VA benefits through April, 1981, was clearly proper. Moreover, even indulging appellant's very speculative argument that only one-half of the benefits were due under the 1974 and 1975 support orders, appellant would still hardly be due a credit.[9]

Therefore, since substantial evidence supports the trial court's determination that no credit is due appellant, and since appellee stipulates to zero arrearages, the trial court's decision to adjudge appellant "current" on his payments under former support orders is not clearly erroneous.

For the reasons stated in this opinion, the decision on review is affirmed.

*So ordered.*

8. The trial court summarized the total amount due as follows:

| Number of Payments Due | Rate | To | Amount Due |
| --- | --- | --- | --- |
| 278 | $90 Bi-weekly | 6–14–85 | $ 25,020* |
| 74 | $118 monthly | 4–30–81 | $ 8,732 |
| 1 | $250 | 6–30–85 | $ 250* |
| 5 | $500 | 11–30–85 | $ 2,500* |
| | | TOTAL AMOUNT DUE | $ 36,502 |

\* These three sums were unchallenged by appellant, and indeed, could not be.

9. Contrary to the representations in appellant's brief, counsel for appellant, rather than the trial court, inquired into the veteran's education benefits. Moreover, appellant placed before the court all the cancelled checks he paid directly to appellee. Thus, while the record does disclose some misunderstanding about whether evidence of arrearages would be received during the two day hearings, appellant clearly placed evidence before the trial court, which, together with evidence of which the trial court was entitled to take judicial notice, provided an irrefutable ba-

PRYOR, Chief Judge, concurring:

With regard to paternity, I do not think we can fairly mix the credibility of appellant's claim of nonpaternity with his procedural right to scientific testing on the question. Under the total circumstances presented, however, I will concur in affirmance on this issue on the narrow ground that the trial judge did not abuse her discretion in refusing appellant the opportunity to take the test.

I accept the majority opinion in other respects.

sis for the determination that appellant was not